IN THE MATTER OF PAWLOWSKI.

[No. 29,751. Filed March 30, 1960. Rehearing denied April 26, 1960.]

*Leo L. Cook,* and *Harry S. Taylor,* both of South Bend, for respondent.

*Edwin K. Steers,* Attorney General, *Owen S. Boling,* Assistant Attorney General, *Robert W. McNevin,* Deputy Attorney General, attorneys for Disciplinary Commission.

*Arthur A. May, Robert E. Zimmerman, Joseph A. Roper,* all of South Bend, *Amicus Curiae.*

ARTERBURN, C. J.—The Disciplinary Commission of the Supreme Court of this State has filed an information

for the disbarment of Joseph T. Pawlowski, a practicing attorney in South Bend, St. Joseph County, Indiana. This proceeding comes before us pursuant to Rule 3-22. The Attorney General prosecuted the proceedings. The Hon. Clifford O. Wild was appointed by this Court as Commissioner to hear the evidence and report his findings. A hearing was held before the Commissioner, who has filed a transcript of the evidence heard, along with findings.

The primary issue formed on the information and answer was whether or not with respect to six specifications therein, the respondent's conduct as an attorney was such as to constitute grounds for his disbarment.

We should keep in mind that this proceeding is not an appeal but rather an original action filed in this Court. We are sitting as any trial court, hearing a matter referred to a commissioner for the purpose of taking evidence and submitting his recommendations along with the evidence to the court for action. We may thus review and weigh the evidence and are not limited in its examination as on an appeal.

In Lowe's Revision of Works' Indiana Practice Forms 3, §§53.65 and 53.66, pp. 334, 335, it is said:

"The report of a master commissioner is advisory only and is merely a means of bringing the evidence before the court, and as an aid to the court in the performance of its duties. The court is not bound to accept the master's findings or conclusions, but may accept such as it approves and reject such as it disapproves. Where the evidence is properly reported, and the correctness of the master's finding is challenged, the court must review the evidence, and, if the finding is erroneous, disregard it, and make the proper decision itself."

. . .

"The distinction between a trial by a referee and by a commissioner should be observed. When a

matter is referred to a master commissioner, as such, the trial of the issues is not submitted to him, but he is simply to hear the evidence and report the evidence or the evidence and the facts. The trial still remains with the court, and it is for the court to apply the law to the facts, make a finding thereon, and render judgment accordingly."

Without enlarging upon this opinion, we point out that in Flanagan's Indiana Trial and Appellate Practice, §1712, Comment 8, p. 337, substantially the same comment is made, namely that the report of a commissioner is "only advisory to the court." Indiana, in that respect, conforms with the overwhelming rule prevailing elsewhere. 7 C. J. S., Attorney and Client, §37, p. 804; 33 A. L. R., p. 748.

We not only have the power, but the duty, to reexamine the evidence, regardless of the recommendation and ultimate findings of the Commissioner to satisfy ourselves as to the facts in the case.

The information consisted of six separate specifications.

Specification No. 1 with the Commissioner's finding reads as follows:

"(1) That, on or about the 8th day of December, 1947, while said Attorney Pawlowski was engaged in the defense of one Nelson Williams in the State of Michigan, Berrien County, said Joseph T. Pawlowski did offer to Joseph Killian a bribe if the charges then pending against said Nelson Williams and Roman Luczkowski, who was similarly charged in a companion case, were dismissed; that said Joseph Killian was then and there the duly elected, qualified and acting prosecuting attorney in and for the County of Berrien, State of Michigan."

"(Disciplinary Commission's Exhibit #2, being the deposition of Imogene Dasse is admitted in evidence, the objection to its admission and the motion to strike it out interposed by Respondent being

hereby now overruled. The said deposition is admitted, not as supporting any specific allegation involving deponent and Respondent, but for the purpose of shedding light on a chain of conduct as alleged in Specification #1 of Information of States Exhibit 6, pg. 32-statement of Mr. Newkirk)."

"Your Commissioner now finds that, during the trial of the case of the People of the State of Michigan vs. Nelson Williams in the Berrien County, Michigan Circuit Court in December, 1947 on a felonly charge; Joseph T. Pawlowski, as defense counsel, and Joseph E. Killian, Prosecuting Attorney in the case, had a conversation in the court house, just outside the court room during a recess while said trial was in progress. At said time and place Respondent, Joseph T. Pawlowski, said in substance to said Prosecuting Attorney that he would receive a substantial 'fee' of five hundred dollars if the charges then pending against defendant and being tried were dismissed."

The main factual issue here was who should be believed—Mr. Killian, the prosecuting attorney, or the respondent Pawlowski? Mr. Killian's testimony was unimpeached. Although many of the witnesses on the other specified charges were persons of doubtful character and credibility because of their implications in crimes, as the Commissioner points out, such challenge cannot be made as to the testimony of Mr. Killian. The evidence shows he has been a practicing attorney in the State of Michigan since 1933; he was in the naval service from 1943 to 1946; he has been an exalted ruler of the Elks Lodge, President of Kiwanis Club, a 32nd degree Mason, Chairman of the District Grievance Committee, a member of the State and American Bar Associations, an active member of the church and for eight years prosecuting attorney.

The essence of Mr. Killian's deposition reads as follows:

"Q. Tell us the entire conversation.

"A. In connection with Pawlowski's offer to me?

"Q. Yes.

"A. I have told you the substance of it as nearly as I recall it. I was standing in the rotunda outside the Circuit Court room in the Courthouse. As I recall, I was smoking a cigarette during a recess in the trial. Pawlowski approached me and engaged me in conversation and during the course of the conversation stated, in substance, to me that if I would see that the charge against whichever defendant was being prosecuted would be dismissed, that charge being a felony, that he would see that I would get a substantial fee of $500. He spoke of it as a fee."

At another point he says:

"I might say that the reason I remember Mr. Pawlowski's bribe is that it is the only time during the eight years that anybody ever offered me a bribe; so I have quite a vivid memory of it in that connection."

Mrs. Dasse, who was the mother of the boy involved in the moral charge then being tried in the case in which Killian says the respondent offered him the bribe, testified that Pawlowski came to her house with a woman, the girl friend of the defendant, who, in the presence of Pawlowski, offered her $100 if she would drop the moral charges in which her small son was involved. Killian, on cross-examination, stated that Mrs. Dasse had come to him a number of times and reported the offer made in Pawlowski's presence. This evidence was offered to show a motive why, when the attempted bribery of Mrs. Dasse failed, an attempt was made to get the prosecuting attorney for $500 to drop the case.

Mr. Pawlowski, when on the stand, denied that he was present when the offer of $100 was made to Mrs.

Dasse to drop the case, but admits that he accompanied the woman to see Mrs. Dasse at her home. He said he remained outside when she went inside to talk to Mrs. Dasse. Such action on the part of Mr. Pawlowski is not probable. An attorney in a case would not ordinarily have another party, a girl friend of the defendant, interview a witness while he sits and waits outside the home. If the visit had an honorable motive in interviewing a party as a witness, why should an attorney make the trip and remain outside? We must believe the testimony of Mr. Killian and Mrs. Dasse. It is consistent and logical. Specification No. 1 has been proved by more credible testimony than that offered by Mr. Pawlowski to the contrary.

Specification No. 2 alleges in brief that Pawlowski, in representing one Verna Walton charged with driving while under the influence of intoxicating liquor, stated he could "fix" her case for the sum of $400 plus costs and that he was paid that sum. A review of the evidence here results in the testimony of Verna Walton being contradicted by that of respondent Pawlowski. Respondent charged Verna Walton $400 and refunded $350 after she was convicted and sentenced. Pawlowski admitted he returned the sum after some newspaper publicity and when he could not get the arresting officer Pastor to reduce the charge to reckless driving. He stated before the Disciplinary Commission that the higher payment for which refund was made, was merely for results in getting the charge dismissed—not for any trial. We shall have further comments about this evidence later in this opinion. However, at this point we agree with the Commissioner that there was no preponderance of the evidence sufficient to sustain Specification No. 2.

Specification No. 3 reads as follows:

"That, on or about the month of July, 1956, the said attorney, Joseph T. Pawlowski, while representing one Albert Backian, who was then charged with a felony, did state to Mr. Backian an offer to 'fix' and have the charges then pending against Mr. Backian disposed of before the matter was presented to the St. Joseph County Grand Jury for the sum of Four Thousand Dollars ($4000.00); that said Attorney Pawlowski did represent to Mr. Backian that the sum of Four Thousand Dollars ($4000.00) was necessary because he had to pay One Thousand Dollars ($1000.00) to Judge Olczac, who was then and there the South Bend City Court Judge, One Thousand Dollars ($1000.00) to Mr. Pat Brennan, who was then and there the duly elected prosecutor in and for St. Joseph County, State of Indiana, and One Thousand Dollars ($1000.00) to a third person whom Mr. Pawlowski failed to name, and the remaining One Thousand Dollars ($1000.00) was to be paid to the said Attorney Pawlowski for his services; that, when said Backian refused to pay Pawlowski the said Four Thousand Dollars ($4000.00), as requested by Attorney Pawlowski, said Pawlowski did withdraw the bond he had posted for the said Albert Backian causing him to be committed to the County Jail, and withdrew from any further appearance of representation of said Albert Backian."

The evidence shows for some reason Albert Backian was not present for the hearing before the Commissioner, although the evidence shows that shortly prior thereto he had promised by telephone conversation to be present, and a telegram had also been sent him to be present. The testimony presented was mainly that of his brother, John Backian, who testified that Albert was at the time in the State of Michigan. The brother John testified that the respondent over the telephone asked him for $4000.00 and said that he would "kill" the original charge and that he had an office next to

the office of the prosecuting attorney and that they were on friendly terms and that "he would use his influence to quash the criminal warrant." We agree with the Commissioner that there is no preponderance of the evidence on the side of the State in Specification No. 3.

Specification No. 4 is a charge that Pawlowski proposed that Lucille M. Crawford, whom he represented on a charge of vehicle taking, enter into prostitution with men he would send her to procure sufficient money to pay his fees. Here again we have a witness, namely, June Marowszki, changing her story at the hearing before the Commissioner from that which she had previously given to the Disciplinary Commission when she said she was present and heard the conversation and took part in it between Lucille Crawford and Pawlowski. Here again we have the testimony of the party making the charge contradicted by that of Mr. Pawlowski and without any real preponderance of the evidence to support the specification. We agree with the Commissioner that the State failed to prove the specification by a preponderance of the evidence.

Specification No. 5 in substance states that the respondent undertook to represent Carlos Kelly for the sum of $500, out of which Pawlowski agreed to pay the fine and court costs which might be assessed against Kelly; that thereafter Kelly paid Pawlowski $500 and that upon a plea of guilty he was fined $100 and $14.75 costs were assessed against him. The evidence shows that Pawlowski failed to pay the fine and costs and that Kelly paid the same. The evidence also shows that Kelly had a receipt from Pawlowski for the $500 dated May 1, 1957, which stated "attorney fees and *city court fines.*" (Our italics.)

Mr. Pawlowski, before the Disciplinary Commission, was asked:

"MR. DASSEL: Is it the customary practice of the lawyers in South Bend to pay the fines and costs in the City Court and include that in the fee?

"MR. PAWLOWSKI: Oh, sure.

. . .

"MR. DASSEL: But it is customary up there that the attorney takes care of the fine and includes it in the fee?

"MR. PAWLOWSKI: Yes."

The Commissioner made a finding to the effect that the respondent did give a receipt to Kelly for "attorney fees and city court fines," yet respondent, in the face of this receipt, admits he did not pay the fine and costs in the city court case. Before the Commissioner he stated that "this receipt" was given to Mr. Kelly "for services in city court, in Superior Court No. 2 and costs in No. 1 (Superior Court)." This is contrary to reasonable deductions from the facts.

Kelly states that he employed respondent *only in the city court* case at the time the receipt was given. The record bears out Kelly's testimony that he had another attorney, Mr. Edward Minczeski, at the time employed in the Superior Court case. Pawlowski, although his testimony is conflicting when given before the Commissioner on this point, was quite clear when he was questioned before the Disciplinary Commission, testifying as follows:

"Attorney Edward Minczeski who notarized the statement of Mr. Kelly which is before the Board, withdrew his appearance in Superior Court No. 1 in Cause No. 11028 and *I, then, appeared as counsel for Mr. Kelly on the 16th day of September, 1957.*" (Our italics.)

The receipt is dated May 1, 1957. The record shows that Kelly was fined $100 and $14.75 costs on the 7th day of June, 1957, which he paid on that date. The receipt could not at the time have been given "for services in city court, in Superior Court No. 2 *and costs in No. 1 (Superior Court).*" The receipt speaks for itself.

Specification No. 6 states:

"That said Attorney Joseph T. Pawlowski did, undertake the representation of one James Nyikos who was then and there charged under indictment in the St. Joseph Superior Court 1 for the offense of driving while under the influence of intoxicating liquors and that said Attorney Pawlowski did represent to Mr. Nyikos that he could have the indictments then pending against Mr. Nyikos taken care of but that it would cost him a lot of money due to the fact that he, Pawlowski, would have to pay off a lot of people. Pursuant to representation of said Pawlowski, said Nyikos then and there paid to Attorney Pawlowski the approximate sum of Twenty-Five Hundred Dollars ($2500.00). The said Attorney Pawlowski continued to have the charge then pending against said James Nyikos continued and that Mr. Pawlowski kept reassuring said James Nyikos that, 'Don't worry about anything. Everything has been taken care of.'; that, pursuant to said representations of the said Pawlowski, said Nyikos entered a plea of guilty to said charge and that, on or about the 14th day of October, 1957, pursuant to a telephone call from Attorney Pawlowski, said Nyikos met said Pawlowski at St. Joseph Superior Court 1, whereupon the court proceeded to sentence said Nyikos for one to three years imprisonment and fined him the sum of Five Hundred Dollars ($500.00) at which sentence said Attorney Pawlowski wholly failed and neglected to make any plea for and on behalf of said Nyikos, but, after said sentencing, said Attorney Pawlowski stated to said Nyikos not to worry or take any further action because everything had been taken care of and that he, Nyikos, would only have to serve three months of said sentence."

The evidence relative to this charge shows some peculiar and unusual activities on the part of both the respondent and the prosecuting attorney of St. Joseph County. It reveals the taking of a tape recording of Nyikos three days after he had been sentenced (October 14, 1957) and during a furor created by considerable publicity connected therewith. As a result of this tape recording made by the prosecuting attorney with Pawlowski present, we find the witness Nyikos changing his statements from those previously made.

Nyikos later as a witness in this proceeding testified by deposition at the Indiana Reformatory on May 19, 1959. The evidence showed that he had been arrested in 1953 for driving while under the influence of intoxicating liquor. This was a second offense, for which he is now serving. At that time he had an attorney other than Pawlowski. Pawlowski says he came into the case about January, 1957 at the request of attorney Paul Paden. Nyikos testified that he was called by Paden to come to the courthouse and that a conversation took place with Mr. Pawlowski as follows:

"A. Mr. Paden introduced Mr. Pawlowski and myself and he said, 'Now, it's all yours. I'm going to let Joe (Pawlowski) lay down all the facts.' He said words to this effect. 'Whatever Joe tells you, he will do. He is the man that can deliver it. If anybody can fix anything through Pat Brennan's office, it is Joe.' Joe Pawlowski said, 'I'll handle this whole ball of wax for you.' At that time, I think there were two, even three drunk driving charges, all several years old. He said, 'It is going to cost you twenty-five hundred smackaroos.' The figure bowled me over and he said, 'if you don't go along with us, if I don't handle it for you, they are going to give you a year on the farm. You might even end up with three years . . .' or was it two,' . . . three years.' It amounted to a threat. 'If

you go along with me, I will fix everything. I will have them dismissed. Pat will do anything I say.'

"Q. You referred to the statement that Pat will do anything that he said. Who is Pat?

"A. He said Pat Brennan and who was then and is still the Prosecutor of St. Joseph County.

"Q. Go on if you will, please.

"A. And I objected to the amount of money, of course. I said that I didn't have this kind of money and I kind of laughed. He said, 'Now I know you have got it. I know you can get it. You don't have to pay me all at once, but so long as it is paid, this will be taken care of.' I asked him how long I had and he said, 'Well, it doesn't make too much difference;' if I agreed to go along with it, 'this damn thing will be headed right here.' And he pointed towards Superior Court 1. So I went into Superior Court 1 and Mr. Pawlowski was with me and the Judge asked me if I was guilty or not guilty. And I was completely surprised. I mean, Mr. Pawlowski, without any consultation with him, without any previous discussion with him whatever, he said, 'I plead him guilty.'

"Q. Let me interrupt you at this time.

"A. Yes, sir.

"Q. Do you recall the interval of time between your conversation with Mr. Pawlowski in the corridors of the St. Joseph County Court House and the time when he subsequently pled you guilty?

"A. Oh maybe ten minutes.

"Q. During that ten-minute interval, did you have occasion to discuss the possible defense or preparation of your case for arraignment or trials?

"A. Again, I don't know how to word this. I don't want to offend anybody's sensibilities."

. . .

"Q. I want you to tell us, Mr. Nyikos, only whether or not in the ten-minute interval that you

just testified to during which time you talked with Mr. Pawlowski relative to taking your case, and the time that you testified that he pled you guilty, whether or not during that period of time you had any conversation with him relative to the preparation of your case for arraignment or for trial; what your defense would be or anything of that nature.

"A. I asked Mr. Pawlowski what he was going to do. He said that my case, if I went along with he and Mr. Brennan, that it would cost me $2500. but that it would probably never come to court. He said, 'This is just an arraignment. This is just to keep the newspapapers off your back.' He did not tell me he was going to plead me guilty. I said, 'What are you going to do?' "

Pawlowski, on the other hand, testified that the only conversation with Nyikos at the time was merely to the effect that he was going to withdraw the plea of not guilty and enter a plea of guilty for Nyikos, then ask for a presentence investigation.

Nyikos further testified that after his plea of guilty was entered on January 8, 1957 Pawlowski took him over to meet a Mr. Parks in the Adult Probation Department of the court. According to Nyikos, Mr. Pawlowski told Parks concerning Nyikos: "Parks, this is a good boy. I want you to see that he gets a good report." Nyikos further testified that he (Nyikos) then spoke to Parks for twenty-five or thirty minutes and Parks assured Nyikos that no doubt he would receive probation. After walking out of Parks' office, Nyikos said that he gave Pawlowski, who was waiting, $200.

Nyikos said that Pawlowski with the $200 in his hands said, "This is for him. I will take care of Parks with this," and immediately walked into Parks' office. Pawlowski denies this. Parks, as a witness, denied he ever was offered or accepted any money from the re-

spondent. The fact as to the actual payment of any money is not significant: The alleged misconduct lies in statements and representations to that effect by an attorney.

On October 14, 1957 Nyikos was sentenced to one to three years in the Indiana State Reformatory and fined the sum of $500. Nyikos testified that he was again assured by Pawlowski that his case would be taken care of or "fixed" and he would not have to serve out the sentence. The evidence does show that a substantial sum, claimed by Nyikos to be $2500 but stated by Pawlowski to be approximately $1850, was paid to Pawlowski by Nyikos *after* Pawlowski pleaded him guilty.

The evidence is undisputed that *three days after* James T. Nyikos was sentenced to the Indiana Reformatory, the prosecuting attorney, Patrick Brennan, had him brought out one night in the presence of Pawlowski and apparently with his understanding and consent and also in the presence of one Robert Johnson and a transcription by tape recording was made of certain questions propounded to and answers made by Nyikos.

Nyikos states prior to the tape recording a conversation with Brennan and Pawlowski took place in which they stated that they wanted him to exonerate them from certain charges being made against them in the nature of a conspiracy to "fix" criminal cases and in particular, his case. That Pawlowski "briefed" him the day before as to what to say and in particular "To say on this recording that he had not said that any of the money was going to anybody but for legal services. And he said, 'Don't mention the full amount of what I was going to charge you.'" It is evident from the testimony that there was considerable newspaper publicity and charges of that nature being made at the

time. Nyikos further says that a considerable amount of time was utilized prior to the tape recording in rehearsing him and coaching him as to what he was to say; that they promised him that Robert Johnson (who was present), a business associate of Nyikos against whom a charge was pending, would have his charge dismissed, as well as that of a brother of Nyikos. Nyikos further claimed that a clip pad was used to indicate how he should answer the question and that the recording device was stopped at times in order to rehearse and rephrase his answers. On the other hand, Brennan states that there was no preliminary rehearsal of the questions and answers, nor promises made to Nyikos. Brennan further stated that the entire conversation, with the exception of a minute or so while he was putting the tape on the recorder, was recorded and made a part of the tape recording; that there were no interruptions or stopping of the recording at any time; that Pawlowski was present all the time and that within five or ten minutes after it was finished, following a conversation between Pawlowski, Johnson and Nyikos, Nyikos was returned to jail.

In conflict with this testimony is the record of the jail which shows that Nyikos was checked out at 8:10 p.m. and returned at 10:20 p.m. (2 hours and 10 minutes), yet the time required to run the recording which was made an exhibit in this proceeding is 25 minutes and 30 seconds. This leaves over one hour and a half of unexplained time other than that necessary to get Nyikos to and from the county jail two blocks away. There is, therefore, nearly one hour and a half of unexplained time in corroboration of Nyikos' contention that the tape recording does not contain all the conversation that took place. A running of the tape recording shows interruptions, which may be stoppages. The time it

takes to run the tape is less than that of one spool. Pawlowski stated the recording was in three sections. Brennan says only one spool was used. Nyikos says two spools were used.

There is the further fact shown that the charges pending against Nyikos' brother and Robert Johnson were thereafter dismissed by the prosecuting attorney. The facts surrounding the making of this tape recording certainly support the testimony of Nyikos that something took place besides that which was merely recorded at the time.

What could be the reason for making this tape recording? We can find no rational basis for a prosecuting attorney taking a man already sentenced out of jail at night and questioning him. Coupling this with the further fact that the man's own attorney of record agreed to such a thing and was present, it creates a still more questionable practice. It is unusual, to say the least, that a man's own attorney would permit such a practice.

The substantial sum ($1850 to $2500) paid *after* a plea of guilty also creates a peculiar strangeness about the representation of Nyikos by Pawlowski. Pawlowski contends this also included services in three other cases. However, all the record shows in each of those cases is an appearance by Pawlowski and the arraignment continued.

Mr. Brennan testified before the Commissioner that he had known Mr. Nyikos prior to the taking of the tape recording, that he had known him when they attended Notre Dame University and on social occasions, yet in the tape recording Mr. Brennan asks Nyikos the following questions and receives the following answers:

"Brennan: Q. And well, since I am right here and it is so handy for you, have you and I ever been acquainted?

"A. No we have never been acquainted with each other, socially or otherwise.

"Brennan: Q. Well, this is about the first time you and I ever had a conversation, isn't it?

"A. Yes, it is."

When Mr. Pawlowski appeared before the Disciplinary Commission he was told that he was entitled to make such statement as he desired to make, although he was not required or compelled to make any answer to the charges and specifications. At that time, upon inquiry, he stated that he had no notice or knowledge from anyone that any charges against him were being investigated or had been filed by the St. Joseph Bar Association's Grievance Committee or anyone else prior to those of which he was notified by the Disciplinary Commission in this case. This statement was reiterated by him a number of times in the preliminary questioning before the Disciplinary Commission, yet we find that when the tape recording was made in respondent's presence, one of the facts sought to be brought out was that Mr. Arthur May and other attorneys of the St. Joseph Bar Association were making an investigation and obtaining statements with reference to alleged unethical conduct of Pawlowski and the prosecuting attorney of that county. Mr. Pawlowski, on cross-examination, admitted he was present during the making of this tape recording. His testimony is as follows:

"Q. What happened after they brought Mr. Nyikos from the jail?

"A. Mr. Nyikos gave Mr. Brennan a statement on a tape recording.

"Q. Were you there all the time?

"A. I was there all the time when he gave his statement."

Mr. Pawlowski knew the contents of the tape recording when he appeared before the Disciplinary Commission, yet he left the impression that he was unaware that the St. Joseph County Bar Association had been investigating his activity. When respondent testified before the Commissioner he stated on cross-examination he had been before the Grievance Committee of the St. Joseph County Bar Association numerous times.

There are too many discrepancies in the testimony of the respondent and evidence offered by him for us to accord it the standing and weight which is required to exonerate him.

With the attempted bribery in the Killian and Dasse cases before us, there are too many other material witnesses who changed their testimony in favor of the respondent after charges were filed, for one to feel the number is a coincidence. The story of the tape recording of Nyikos does not erase such feeling.

The evidence as a whole reveals considerable criticism, apparently from the Bar, the police department and newspapers because of certain attorneys, including Pawlowski, engaging in the bail bond business; the delays in filing any charges against persons arrested, (even though they gave bail) and particularly the way the cases concerning driving while intoxicated were handled. The Verna Walton case may be taken as an example, although it is not the only instance of the criticized practice.

Pawlowski, when appearing before the Disciplinary Commission, admitted that no charge was filed against Verna Walton at the time of her arrest, (March 13, 1957) although he gave a $750 bond for her appearance on March 22, 1957. Charges were not filed until a month later (April 15). The matter was continued six times until May 3rd, when she was finally arraigned

and tried. Pawlowski charged $75 as a bond premium and $400 as attorney fees. He admitted he refunded $350 when he found out, after talking to the arresting officer Pastor, that he could not reduce the charge from driving while intoxicated to reckless driving. He states that he retained only $50 and the $350 was for the main purpose of him getting the charge reduced through officer Pastor.

It was brought out that the refund was made to Verna Walton and Pawlowski got out of the case when certain newspapers in South Bend and the chief of police began some investigation with reference to the disposal of cases concerning drunken drivers, the bail bond business (in which Pawlowski was also engaged), and police officers directing defendants in such instances as to whom to employ. Pawlowski also admitted that on holidays such as Christmas and Easter, he made gifts of a fifth of whiskey or cigars to the police officers and accommodated them in other matters such as loans.

Further questioning before the Disciplinary Commission brought out the fact that Mr. Pawlowski had stated he had acquired a reputation for representing people jailed for drunken driving. He was asked:

> "In 1957 how many people did you represent that were or were about to be charged with driving while under the influence of intoxicating liquor?
> "In 1957? Oh, I would say about forty—thirty-five or forty."

At another point he was asked:

> "How many cases did you have in the year preceding this difficulty here—how many cases did you have in 1957 where the arrest was for operating under the influence and how many were actually charged with this rather than reckless driving.

432

"Mr. Pawlowski: These records are very easily obtainable—therefore, I will state if there are more than two I am quite mistaken."

Coupled with the statements that there were working arrangements with the law enforcement officers and prosecuting attorney, the situation has an ugly and unsavory odor, to say the least. The bail bond business certainly is not compatible with that of the practice of law in the criminal law field. It is allied too closely with solicitation of business from defendants and, where coupled with gifts and payments to police officers and jailers by attorneys, it creates an undesirable influence and unsavory odor surrounding the practice of law.

Although in some of the specifications against the respondent we agree with the Commissioner that the evidence does not preponderate in favor of the State, yet through most, if not all the charges and evidence offered in support thereof, there is a consistent theme permeating the testimony of practically all the witnesses of offers to or attempts to bribe and illegally influence law enforcement officials and witnesses. Too frequently from the witnesses there comes the statement that the respondent told them the cases will be "fixed"; that he had undue influence with the prosecuting attorney; that they were in college together; that he had an office next door to the prosecuting attorney; that he dealt primarily with influencing the police officers and law enforcement officers in reducing or filing no charges. An attorney should at all cost avoid the meaning or inference that he does or can indulge in such methods on behalf of a client.

We are aware that he denied such statements, but certainly there comes a time when such denials are overwhelmed by testimony to the contrary—even though

the individual witnesses may not, standing alone, measure up to the best standards of credibility. When the testimony from numerous individual witnesses predominates the evidence on this theme, it finally becomes convincing.

Evidence should not be weighed in fragmentary parts, but rather viewed as a whole to see or understand the pattern which it presents. It has been said the test is not to be applied to isolated items, but rather to the probative force of all the items when put together. *Hinshaw* v. *State* (1896), 147 Ind. 334, 47 N. E. 157; *Mid-Continent Petroleum Corp.* v. *Weaver* (1936), 103 Ind. App. 96, 5 N. E. 2d 146; *Bell* v. *McCain* (1936), 102 Ind. App. 291, 2 N. E. 2d 241.

The preponderance of the evidence involving the respondent in such questionable activities is sufficient to raise seriously the question of his character as an attorney. The matter of a sufficient character is the basic issue here. We cannot brush aside the compelling accumulation of evidence showing a breakdown in the morality of the respondent in the practice of law which runs through the testimony as a whole. We are inclined to give credence to such general and predominating testimony to that effect.

This is not an isolated and unrelated incident of the respondent yielding to temptation in some transaction outside the practice of law. Rather we have a breakdown in the moral character shown to exist in the activities connected with the judicial processes.

Needless to say, we could not and have not attempted to set forth all the evidence presented in this proceeding. We have attempted to present those items which have influenced our decision.

The motion on behalf of the State to strike out the preliminary memorandum of the Commissioner is over-

ruled for the reason, as previously stated, his findings and comments are advisory only. The exceptions of the respondent and those on behalf of the State are overruled. The Court finds that the respondent, Joseph T. Pawlowski, by reason of improper acts and practice while an attorney at law, lacks the high character necessary for a member of the Bar of this State.

IT IS THEREFORE ORDERED AND ADJUDGED that the said Joseph T. Pawlowski be and he is hereby disbarred from the practice of law in this State and his name is ordered stricken by the clerk of this Court from the roll of attorneys authorized to practice law in this State.

Achor, Bobbitt and Landis, JJ., concur.

Jackson, J., concurs in result.

NOTE.—Reported in 165 N. E. 2d 595.