**In the Matter of Robert F. CRAVEN.**

**No. 278S32.**

Supreme Court of Indiana.

May 30, 1979.

Vance M. Waggoner, Rushville, for appellant.

Sheldon A. Breskow, Ind. Supreme Court, Disciplinary Comm., Indianapolis, for appellee.

DISCIPLINARY ACTION

PER CURIAM.

This proceeding is before the Court on an one-count verified complaint filed by the Indiana Supreme Court Disciplinary Commission pursuant to Admission and Discipline Rule 23, § 12. Pursuant to the provisions of Admission and Discipline Rule 23, this cause was heard by an appointed Hearing Officer. The Respondent has petitioned this Court to review the findings and conclusions of the Hearing Officer and both parties to this proceeding have submitted briefs in support of their respective positions.

In his petition for review, the Respondent challenges specific findings of fact and the factual and legal conclusions drawn relative to the findings, asserting that the findings and conclusions are contrary to the evidence. Issues of this nature are resolved through the review process employed by this Court in disciplinary proceedings. In the case of *In re Murray,* (1977) 266 Ind. 221, 362 N.E.2d 128, appeal dismissed, 434 U.S. 1029, 98 S.Ct. 758, 54 L.Ed.2d 777 (1978), this court detailed this process of review:

"It should be noted at the outset that a disciplinary proceeding is an original action in this Court. *Ind.Const.,* Art. 7 § 4. As such, this Court sits as a trial court and must determine issues of fact; this clearly distinguishes the disciplinary proceeding from an appeal. *In re Pawlowski* (1959), 240 Ind. 412, 165 N.E.2d 595. "Recognizing this distinction, in the absence of any agreement by the parties as to factual issues, this Court examines and reviews all matters which have been submitted in a particular cause. An examination of the previous opinions of this Court demonstrates that the findings of fact are only the initial starting point for

review by this Court. See, *In re Wood* (1976), 265 Ind. 616, 358 N.E.2d 128; *In re Smith* (1976), 266 Ind. 6, 351 N.E.2d 1; *In re Bradburn* (1966), 248 Ind. 29, 221 N.E.2d 885; *In re Holovachka* (1964), 245 Ind. 483, 198 N.E.2d 381. It is through this complete examination of all matters that this Court makes its ultimate findings of fact upon which a determination of misconduct is weighed. The findings of the Hearing Officer thus are reviewed within this Court's consideration of all relevant matters. These findings do receive emphasis in that the Hearing Officer observes the witnesses, absorbs the nuances of unspoken communication, and by this observation attaches credibility to the testimony, but such findings are not necessarily controlling on this Court and never have been. *In re Pawlowski, Supra.*

"In the end, the findings of fact reached by this Court are the product of this Court's examination of the entire record with the above noted consideration being given to the findings of fact submitted by the Hearing Officer. Thus, there is no standard of review as applied within the appellate procedure, but merely the application of a process of determination whereby this Court finds facts as is required in all original actions."

Under the complaint filed in this cause, the Respondent is charged with professional misconduct in the course of the legal representation of a client with a claim for medical malpractice. The Respondent is specially charged with representing clients when the exercise of the Respondent's professional judgment would or reasonably could be affected by his own financial, business, property, and personal interests in violation of Disciplinary Rule 5–101(A); with failing to adequately represent clients in violation of Disciplinary Rule 6–101(A)(3); with deceiving or attempting to deceive his clients, thereby engaging in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of Disciplinary Rule 1–102(A)(4); and with engaging in conduct which adversely reflects upon his fitness to practice law, in violation of Disciplinary Rule 1–102(A)(6).

Employing the process of review above noted, this Court has reviewed all matters which have been submitted in this cause and now finds that the Respondent, an attorney admitted to practice on December 14, 1955, was engaged in the private practice of law in 1972, and was a partner in the law firm of Craven and Milan, which had offices ·in Indianapolis and Paoli, Indiana. On March 5, 1972, Rose C. and James W. White, husband and wife, retained Indianapolis attorney, Stanley R. Fish, an associate in the firm of Craven and Milan, to represent them in the prosecution of a medical malpractice claim, resulting from alleged injuries which occurred on or about September 16, 1970.

On March 23, 1972, Mr. Fish, on behalf of the Whites, filed a complaint in the Marion County Superior Court, Room 4, under Cause Number S472–368. Harry Siderys, M. D., John Pittman, M. D., Gilbert Herod, M. D., and Methodist Hospital of Indiana, Inc. were named as defendants. Doctors Siderys, Pittman, and Herod were represented by attorneys Claude M. Spillman, Jr., and Jon D. Krahulik; and Methodist Hospital was represented by attorneys William B. Weisell and Michael A. Bergin.

On November 1, 1972, Mr. Fish left the firm of Craven and Milan. The Respondent assumed representation of the Whites in the aforesaid medical malpractice matter.

Pre-trial conferences were scheduled in this cause for September 28, 1973, and February 21, 1974; a trial date was scheduled for March 11, 1974, this cause being fifth on the calendar.

By agreement of the parties, the scheduled conferences were never held. Sometime prior to February 21, 1974, the Respondent left a telephone message for Jon D. Krahulik indicating his desire to have the trial continued. In response to said message, Jon D. Krahulik drafted and sent a letter to the Respondent setting out his objection to a continuance in the cause and stating that he was "going to prepare to try the case on March 11, 1974."

A standing rule of Marion County Superior Court, Room No. 4, while the Honorable Frank A. Symmes, Jr., was presiding, was that motions for continuance had to be filed in writing with the Court prior to trial. The Respondent, at no time filed such a motion, although he had instructed his secretary to prepare and file a motion requesting a continuance in this cause. The jury trial docket in Judge Symmes' court was set up so that more than one case was scheduled for the same day. Each case was assigned a number and the attorneys were expected to be prepared to try the case on the assigned day. If no cases were settled, only the "first choice" cause would be tried. Should the "first choice" cause be settled, then the "second choice" cause would be tried, and so on. *White v. Siderys, et al.* was initially scheduled for the "fifth choice" on the docket for March 11, 1974.

Sometime during the week prior to trial, the bailiff of Superior Court Number 4 informed an associate in the Respondent's Indianapolis law office that *the White v. Siderys, et al.* cause had been moved up on the trial docket. The Respondent was informed by his associate of this conversation prior to March 11, 1974.

Mr. Bergin, through inquiries to the Court and counsel on those cases set ahead of the *White* cause, discovered sometime on Friday, March 8, that the *White* cause had been advanced to "first choice" on the Monday, March 11, docket. Subsequently, he contacted Mr. Krahulik (who was out of town on March 8) and informed him of the setting. Both defendants' counsel were in Court and prepared to proceed with trial on Monday morning, March 11, 1974. The Respondent made no further effort to contact the Court regarding the trial setting. He was not in Court on Monday, March 11, and had not informed his client of this trial setting.

On the morning of March 11, 1974, Judge Symmes, having found that the Respondent's office had been advised that the *White* case was "first choice" on the court's calendar for March 11, on his own motion dismissed the jury and the cause of action.

Shortly after March 11, 1974, the Respondent learned of the dismissal, placed a telephone call to Judge Symmes and went to the court. Judge Symmes would not discuss the matter with the Respondent. On March 18, 1974, the Respondent filed a Motion to Reinstate the cause; this motion was overruled on April 19, 1974. On May 15, 1974, the Respondent filed a Motion to Correct Errors in the cause; this motion was overruled on June 19, 1974. All the post-trial activity was done without the clients' knowledge or consent. The Respondent allowed the time limitations in which an appeal may be perfected to expire without informing the clients the case had been dismissed and without conferring with the clients regarding the appellate possibilities. No further proceedings were ever filed relative to this cause.

Throughout the spring, summer and fall of 1974, Mr. White made repeated telephone calls to the Respondent's office to inquire into the status of his case. The Respondent did not return these calls.

As early as May 22, 1974, the Respondent notified his legal malpractice insurance carrier, St. Paul Fire and Marine Insurance Company, of a possible claim against his policy by James W. White or Rose C. White. Communications between the Respondent and his insurer continued throughout the summer and fall of 1974. These communications include numerous telephone conversations between the Respondent and Myrna Augustine, a claim loss representative for the insurance carrier; letters dated June 5, 1974, August 28, 1974, September 19, 1974, October 24, 1974, and December 10, 1974, addressed to the Respondent from Ms. Augustine; and a three-page letter dated September 5, 1974, from the Respondent to Ms. Augustine, setting out in detail the White matter and containing some ten attachments consisting of pleadings, an employment contract, and court notices, all pertaining to his representation of James and Rose White.

Sometime in December 1974, Mr. White telephoned the Respondent's Indianapolis law office. The Respondent informed Mr.

White that he wished to meet with him and discuss their case, that he had some "bad news". On or about December 23, 1974, the Respondent and Mr. and Mrs. White met in the Respondent's Indianapolis law office. At this meeting, the Whites were, for the first time, informed that the complaint filed on their behalf was dismissed in March of 1974. The Respondent told the Whites that he would approach the defendant's insurer and attempt to negotiate a three-thousand-dollar ($3,000.00) settlement on their behalf, and that was the only chance for recovery by them. The Whites were not informed of the Respondent's contacts with his malpractice carrier, nor was the subject of legal malpractice insurance ever raised by the Respondent.

On January 9, 1975, St. Paul Fire and Marine Insurance Company/St. Paul Mercury Insurance Company issued a draft payable to the Whites and attorneys Craven and Milan in the amount of three thousand dollars ($3,000.00). This draft was considered by St. Paul as a settlement on any possible claim made on behalf of the Whites against the legal malpractice policy of Craven and Milan. The Respondent personally approved of this settlement figure on January 10, 1975.

On Saturday, January 11, 1975, Mr. and Mrs. White met with the Respondent at his request, in his office. No other persons were present in the Respondent's office aside from himself and the Whites. He informed the Whites that the defendants had agreed to settle the medical malpractice matter for three thousand dollars ($3,000.00), and that he had a check from the insurance company in that amount as settlement of the matter. The Respondent and Mr. and Mrs. White, after considerable debate over the value of the Respondent's services, arrived at a deduction of three hundred fifty-eight dollars and sixty cents ($358.60) as attorney's fee for the Respondent, of which a portion was to be used by the Respondent as expenses he incurred on behalf of the Whites. This is denied by the Respondent, as was every other contention of the Whites. The Respondent had Mr. and Mrs. White endorse the aforementioned

St. Paul check. He then presented Mr. and Mrs. White with a check drawn on the account of Craven and Milan in the amount of two thousand six hundred forty-one dollars and forty cents ($2,641.40).

At no time subsequent to the dismissal of *White v. Siderys, et al.* on May 11, 1974, did the defendants in that matter offer any indication to the Respondent that they would be willing to "settle" said case nor were any settlement negotiations considered by the defendants.

In his Petition for Review, the Respondent, citing his testimony given during the hearing of this cause, sets forth a different version of the events leading to the March 11, 1972, trial date in the *White* case. He denies any responsibility for the dismissal of this cause, arguing that court personnel failed to keep him apprised of the status of this case and that his staff failed to prepare and file, as instructed, a motion for continuance. Having examined all evidence relative to this argument, this Court does not find Respondent's interpretation of the evidence persuasive. There appears to be no question that the Respondent failed to adequately meet his responsibility to the Whites in this litigation.

The Respondent further argues that the Whites were fully advised of their possible claim against the Respondent and consented to his continued representation, even against his own malpractice insurance carrier. It is the Respondent's assertion that these clients were aware of the origin of the three-thousand-dollar settlement check and signed a settlement sheet. All papers in the *White* case were found, except this settlement sheet; the Respondent blames its absence on the destructive activities of a dishonest employee. This Court finds the Respondent's assertions to be insufficiently supported in this cause.

The foregoing findings of fact establish that Respondent failed to obtain a continuance of the trial date schedule for his clients' case, failed to appear on such trial date, and failed to represent his clients. As a result, his clients' claim was dismissed, a

matter which Respondent did not disclose to his clients until after the time for appeal had elapsed. Such conduct constitutes neglect of a legal matter and is violative of Disciplinary Rule 6–101(A)(3).

The Respondent represented the Whites' interests in their possible claim against Respondent himself and his malpractice insurer, without disclosure to the clients and without their consent. These facts establish a flagrant conflict of interest. Respondent represented the Whites when his professional judgment would have been or reasonably could have been affected by his own financial and business interests. Such conduct violates Disciplinary Rule 5–101(A).

Throughout Respondent's handling of the Whites' claim, Respondent chose to withhold information and misrepresent facts. He failed to disclose to his clients that their case had been dismissed until after the time to appeal had passed. He failed to inform his clients that he had placed a claim with his own malpractice insurance carrier on their behalf. He failed to disclose to his clients the origins of the money which they received, under the misconception that such funds came from the defendants in the medical malpractice suit. By so deceiving his clients, Respondent engaged in conduct involving dishonesty, deceit, and misrepresentation in violation of Disciplinary Rule 1–102(A)(4).

The Respondent's conduct in this course of representation further establishes that the Respondent violated disciplinary rules and engaged in conduct which adversely reflects on his fitness to practice law. Accordingly, this Court now additionally finds that the Respondent violated Disciplinary Rule 1–102(A)(1) and (6).

It now becomes the duty of this Court to impose an appropriate disciplinary sanction for the professional misconduct found in this case. The Respondent's activities in this matter depict an unfortunate sequence of events which was initiated by an apparent oversight and concluded by outright misrepresentation. Throughout the entire course of events, at each crucial decision, the Respondent abandoned his ethical responsibilities and compounded his professional dilemma. The Respondent first neglected his clients, then represented these clients under circumstances wherein the Respondent's own personal and business interests were in direct and obvious conflict, and, lastly, misrepresented crucial and material facts to these individuals who had sought his professional services.

This Court has repeatedly stated that the essence of the fiduciary relationship between a lawyer and client is trust. A lawyer must constantly strive to maintain this trust in that no lawyer can effectively represent the interests of any person without its presence. The Respondent in this case took the trust placed in him by his clients and used it to the detriment of the clients and to the personal advantage of the Respondent. Conduct of this nature casts a negative impression upon the entire legal profession.

In light of the foregoing considerations, this Court finds that a period of suspension is in order. Therefore, by reason of our findings of misconduct charged under the verified complaint filed in this cause, it is now ordered that the Respondent be, and he hereby is, suspended from the practice of law in the State of Indiana for a period of not less than one year, beginning July 1, 1979, and that he pay the costs of this disciplinary proceeding.