IN THE MATTER OF OWEN W. CRUMPACKER.

[No. 974S187. Filed November 29, 1978.]

Owen W. Crumpacker, pro se, John M. Lyons, of Valparaiso, for respondent.

David B. Hughes, for Indiana Supreme Court Disciplinary Commission of Indianapolis.

PER CURIAM.—This proceeding is before the Court on a nineteen count amended complaint filed by the Disciplinary Commission of the Indiana Supreme Court pursuant to Admission and Discipline Rule 23, Section 12. A Hearing Officer was appointed, the cause was heard, and the Hearing Officer has filed his findings of fact, conclusions of law and his recommendation. The Disciplinary Commission and the complainant have now petitioned, pursuant to Admission and Discipline Rule 23, Section 15(a), for this Court to review the findings of the Hearing Officer and the Respondent has submitted objections and supplemental objections to the petition for review. Both the Disciplinary Commission and the Respondent have filed briefs in this cause.

In the course of extensive proceedings which have already transpired in the cause and in their respective pleadings before this Court, the Disciplinary Commission and the Respondent have raised several issues which affect this cause in general. These general issues will be addressed prior to reviewing the allegations of misconduct and the evidence of record in support of such allegations.

In his objections and brief in support of such objections, the respondent incorporates by reference three defenses to the allegations of misconduct raised during the hearing stage of this cause. As his first affirmative defense, Respondent asserts that Admission and Discipline Rule 23 is unconstitutional in that it violates the 1st and 14th Amendments to the United States Constitution and Article 1, Sections 13 and 21 of the Indiana Constitution. At

no point in these proceedings, however, does the Respondent set out the specifics of this objection. Instead, the Respondent merely makes the general objection and then in the course of his pleadings attempts to attach such objection to specific assertions of misconduct. At a later point in this opinion this Court will address the specific objections directed toward the charges. Thus, this Court now finds that the Respondent's first affirmative defense, as it stands without specificity, does not present an issue for determination by this Court.

As his second affirmative defense, the Respondent asserts that all the counts of the verified complaint filed in this cause are and constitute the subject matter of pending litigation, the exclusive jurisdiction of which is vested in particular courts of the State.

The fact that the alleged violations of disciplinary rules involve conduct during the course of litigation is no defense. Issues of civil or criminal litigation are not determined in a disciplinary proceeding. Under the Constitution of the State of Indiana, this Court must establish and police standards of professional behavior by the bar. The standard for an attorney's behavior is the Code of Professional Responsibility and such standard exists independent of issues in civil or criminal litigation out of which an allegation of impropriety may develop. *In re Wireman*, (1977) Ind., 367 N.E.2d 1368, *cert. denied*, 56 L.Ed.2d 402. Accordingly, in light of the above considerations, this Court now finds that the Respondent's second affirmative defense is unfounded.

The Respondent, as his third affirmative defense, asserts that a former Disciplinary Commission member had a personal, financial interest in the disbarment of the Respondent; and the Commission, acting through this former member and agents "conspired and confederated with other Lake County attorneys for the accomplishment of a corrupt, illegal and unconscionable plan, purpose and scheme," such plan being the removal of the Respondent as an opponent in certain

litigation. In Volume II of his brief in support of his objections, the Respondent attempts to weave thirty years of litigation in which he has been involved, including these disciplinary proceedings, into one grand master plan of conspiracy involving judges, courts and attorneys. The whole world is a fraud, everyone is driven by corrupt motives, and the only exception to this evil design is the Respondent, Owen W. Crumpacker. Consequently, the Respondent concludes that the whole world is now out to destroy Owen W. Crumpacker.

After examining all matters which have been submitted in this cause, including the transcript of the proceedings before the Hearing Officer, this Court now finds that the Respondent has totally failed in his proof in support of his third defense. The Respondent makes allegations and in the course of questioning witnesses attempts to tie his assertions to events. However, he never accomplishes his purpose; the factual allegations raised in this defense just are not supported by credible, admissible evidence. Accordingly, this Court now finds that the Respondent's third affirmative defense is without merit.

Additionally, the respondent, in the pleadings filed in this cause, raises various objections to this disciplinary proceeding and the various counts contained in the verified complaint. The Respondent asserts that many of the charges were predicated on allegations not contained in a grievance filed pursuant to Admission and Discipline Rule 23 and as such were neither appropriately investigated nor considered by the Disciplinary Commission.

This Court has held that a disciplinary grievance will not be strictly construed. Such grievance must merely advise the Respondent of the general nature of the allegations of misconduct made against him. *In re Wireman, supra, In re Murray,* (1977) 266 Ind. 221, 362 N.E. 2d 128, *appeal dismissed,* 434 U.S. 1029, 98 S.Ct. 758, 54 L.Ed. 2d 777 (1978). In the present case, there were three separate

complaints filed and the Respondent specifically waived notice at the administrative level as to several of the allegations of misconduct. We find that the Respondent was advised at the administrative level of these proceedings of the general nature of the allegations upon which the charges in the complaint are predicated.

The Respondent also argues that the events which transpired prior to the adoption of the Code of Professional Responsibility cannot constitute a basis for a disciplinary proceeding. The Respondent, however, does not further develop this issue. This Court, prior to the adoption of the present disciplinary rules, did impose discipline, and the standards for such conduct were the Cannons of Professional Ethics of the American Bar Association. *In re Kuzman*, (1975) Ind., 335 N.E.2d 210, *Tokash* v. *State*, (1953) 232 Ind. 668, 115 N.E.2d 745. Accordingly, where it is properly charged, this Court will examine events which allegedly transpired prior to the effective date of the Code.

Next, the Respondent objects to various charges in the verified complaint arguing that these matters allege criminal misconduct which should afford him the protection of a criminal defendant; he further asserts that the death of a witness has denied him his rights of confrontation and the accusations which center on direct or indirect contempt really are matters to be resolved through civil or criminal proceedings.

These objections merely parallel Respondent's second affirmative defense which was previously noted and determined to be unfounded. We again note that a disciplinary proceeding stands independent of any criminal or civil proceeding. A disciplinary proceeding cannot alter a valid judgment and the fact that a civil or criminal cause was or was not commenced against the Respondent has no bearing on the pro-

priety of a particular disciplinary proceeding relating to similar factual matters. Accordingly, we find that Respondent's objections as set out above are without merit.

The remaining portion of the petitions for review filed by the Disciplinary Commission and the complainant, and the objections and supplemental objections filed by the Respondent concern the substantiation of alleged acts of misconduct and the factual and legal conclusions to be drawn from the factual findings. These issues are resolved through the review process employed by this Court in disciplinary matters. Ultimate findings of fact upon which a determination of misconduct is weighed are reached through a complete examination of all pleadings, including the transcript. The findings of the Hearing Officer are considered; however, they are not controlling on this Court. *In re Wireman, supra, In re Murray, supra, In re Pawlowski,* (1959) 240 Ind. 412, 165 N.E.2d 595.

In the present case, the Respondent, through the customary courtesies extended attorneys of record, obtained the exhibits considered during the hearing stage of this cause. Ostensibly, such exhibits were obtained to allow the Respondent an opportunity to prepare his response to the petitions for review submitted by the Disciplinary Commission and the complainant. Although stating that he would do so and although being requested to do so on several occasions, the Respondent has failed to return the exhibits placed in his custody and care. The Disciplinary Commission, in their brief, has summarized the relevant exhibits and the Respondent has not specifically objected to such summaries. Accordingly, this Court has employed the summaries submitted by the Disciplinary Commission and taken judicial notice of the records of this Court in its review of the Hearing Officer's findings of fact.

Counts I, II, III, V, VI, XI, XII, and XIII are all interrelated and generally deal with the Respondent's litigious assault on

former members of his law firm, former clients, and others perceived by the Respondent to be associated with his former partners. It is noted at the outset that many of these charges involve conduct which occurred during the course of litigation. The Code of Professional Responsibility does not restrict advocacy and this Court does not suggest in any way that a lawyer should not provide zealous representation. Yet, a legal proceeding is not a vehicle for personal vilification and when a lawyer's decisions, pleadings, and practice develop into tools for self-interest, he ceases to be a zealous advocate. The lawyer at this stage becomes an impediment to the practice of law and violates the Code of Professional Responsibility.

The first two counts emanate from the Respondent's alleged conduct during the appeal of a cause from Lake County, captioned *Dedelow Inc. et al.* v. *Board of County Commissioners et al.* In general the Respondent is charged with improperly asserting that he represented the appellees and improperly submitting a scurrilous pleading. Specifically, the Respondent is charged under both counts with violating a disciplinary rule, with engaging in conduct involving dishonesty, fraud, deceit or misrepresentation, with engaging in conduct prejudicial to the administration of justice, and with engaging in conduct that reflects adversely on his fitness to practice law, in violation of Disciplinary Rules 1-102(A)(1), (4), (5), and (6).

After reviewing all matters submitted in this cause, the Court now finds that in the spring of 1972 the Respondent was a partner in the firm of Crumpacker, Abrahamson and Reed. In May 1972, Abrahamson and Reed announced their intent to leave the firm. By the end of 1972, the plans were finalized by Abrahamson and Reed and there was no question as to the fact that they were leaving. The Respondent left for a vacation in Colorado and locked his files in his office. As a condition to getting office files, the Respondent demanded that the clients of Reed come into the office and discuss, with the

Respondent, Reed's representation in the future. The Respondent also demanded possession of Reed's personal bank accounts for scrutiny.

The *Dedelow case* was an action brought by Dedelow Inc. as the unsuccessful low bidder on a county project seeking injunctive relief plus damages. The case was filed in 1971 by Kenneth Reed. He signed the pleadings in the firm name and in his own name. The Respondent never participated in the law suit. The trial court found for plaintiffs, imposed injunctive relief, but did not award damages. Defendants appealed.

The defendants filed their brief on December 31, 1972. Plaintiffs below (Dedelow) had forty days to respond which came about during a period of time in which the Respondent's firm was dissolving. Peter Vukovich, house counsel and secretary for Dedelow, Inc., gave the Respondent a check covering costs due and requested that the Dedelow files be turned over. He never received what he requested. James Dedelow, Vice-President of Dedelow, Inc., thought that he employed Reed and not the Crumpacker firm.

On January 29, 1973, the Respondent filed a verified petition for extension of time to file the brief for Dedelow and was given the record of proceedings. (The Respondent has asserted that he had authority to file the petition by reason of the fact that he was the senior partner in the law firm at the time the initial complaint was filed.) Thereafter, Reed filed for time and requested possession of the record. The Court of Appeals set a hearing on March 5, 1973, to determine who represented Appellee Dedelow.

Reed and Abrahamson employed counsel, Fred G. Donnersberger, to represent them concerning the dissolution with the Respondent. Prior to the Court of Appeals hearing, the Respondent prevailed on Donnersberger to get such hearing called off. When Donnersberger informed the Respondent that it would be held as scheduled, the Respondent retorted, "You snake son-of-a-bitch, that leaves but one thing for me to

do, to go down and load up both barrels of my gun, and I'll getcha."

The Court of Appeals held the hearing and gave both parties claiming to represent appellee until March 12, 1973, to file papers on the issue of representation. At the March 5th hearing Donnersberger tendered the Court a copy of a resolution of Dedelow, Inc. showing that the Board of Directors unanimously voted to have Reed represent them in the litigation then pending before the Court of Appeals.

On March 11th, the Respondent filed in the Court of Appeals a motion entitled "Motion of Defendant-Appellee (sic) James R. Dedelow for Review on Records for Fraud Practiced upon the Courts and the Taxpayers of Lake County, Indiana." (This Court has taken judicial notice of such motion.) This pleading alleged that Reed had conspired with the county attorney to produce the "de facto" defeat of his clients in this matter in exchange for the defeat of the county in other litigation, commonly known as the "Apple Valley Park" litigation. James Dedelow then filed a *pro se* pleading noting that he did not authorize the filing of the above-noted motion and prayed that it be withdrawn and expunged. The Court of Appeals granted the relief as prayed by James Dedelow.

In light of the above findings of fact this Court now concludes that the Respondent misrepresented to the Court of Appeals his status in the *Dedelow* proceedings and used such proceedings as a forum to personally attack a former partner. Accordingly, this Court now finds that the Respondent has violated the Disciplinary Rules, engaged in conduct involving dishonesty, deceit and misrepresentation, engaged in conduct prejudicial to the administration of justice and engaged in conduct which adversely reflects on his fitness to practice law. By such conduct the Respondent has violated the Code of Professional Responsibility as charged under Counts I and II of the amended verified complaint.

Counts III and V are related to Counts I and II and grow out of the Respondent's relationship with one Richard L. Klaas who was a client of the firm of Crumpacker, Abrahamson and Reed prior to the dissolution of this firm in January 1973. Under Count III, the Respondent is charged with using confidential information concerning Mr. Klaas in filing his "Motion of Defendant-Appellee (sic) James R. Dedelow for Review of Records for Fraud, etc.," on March 11, 1973, in the Court of Appeals. Specifically, under Count III, the Respondent is charged with revealing confidences or secrets, using confidences or secrets for the advantage of himself or a third party, violating a disciplinary rule and engaging in conduct which adversely reflects on his fitness to practice law in violation of Disciplinary Rules 4-101(B) (1), 4-101(B) (2), 1-101(A) (1), and 1-101(A) (6) of the Code of Professional Responsibility.

Under Count V of the complaint, the Respondent is charged with naming Klaas as one of 42 defendants in a lawsuit involving the same general subject matter as involved in prior litigation where Klaas was represented by the Crumpacker firm. The Respondent is charged with the same violations of the Code as noted above under Count III, plus improperly using a confidence or secret to the disadvantage of a client which violates Disciplinary Rule 4-101(B) (2).

After examining the matters which have been submitted in this cause, we now find that Richard L. Klaas became interested in developing a mobile home park but ran into difficulty when the County Commissioners denied a petition to have property rezoned. He went to Crumpacker, Abrahamson & Reed in June 1971; he initially requested Mr. Crumpacker, but was referred to Mr. Reed. Since the vote of the Commissioners was 2-0, Reed proceeded to file a declaratory judgment action in Lake Superior Court Room 5. This action was decided in August 1971 and eventually Klaas received a favorable ruling concerning the rezoning.

The land in question was held in trust by Lake County Trust Company. After Klaas had plans approved by the Planning Commission, Saul Ruman, on behalf of certain affected property owners, brought a suit against Klaas and another suit against the Board of Commissioners in Lake Circuit Court. Klaas was represented by the Respondent's law firm in all of this litigation and paid the firm approximately $7,000. This money was deposited in the firm account. During the course of this litigation Klaas talked over his legal problems with Reed and Crumpacker and provided numerous documents and other materials necessary for the proceedings.

On March 11, 1973, the Respondent filed his motion in the Court of Appeals in the *Dedelow* case asserting fraud on behalf of Reed and Klaas. At this time two appeals were pending in the litigation brought by Ruman for the remonstrators. The Respondent asserted that Reed entered a deal with the attorneys representing the Lake County officials in this cause. Under the alleged terms of such arrangement, Reed was allowed to enter a false entry of judgment in the Apple Valley litigation in exchange for losing the Dedelow litigation. In his motion the Respondent sets out the proposed rent schedules for the trailer park property and some of the details of a compromise agreement being considered by Klaas and the remonstrators. Klaas did not authorize the disclosure of this information.

As noted under Counts I & II, the Court of Appeals ordered the Respondent's fraud motion expunged and stricken. Thereafter, on July 26, 1973, the Respondent, on behalf of Martin J. Connelly and Dorothy Connelly, et al., filed a suit in Lake Superior Court against 42 defendants, including Klaas and Reed, charging that Defendants perpetrated a fraud on the taxpayers of Lake County. Judge Kaul, on September 25, 1973, enjoined the Connellys and others with notice from prosecuting this cause in that it sought to set aside a settlement of a class action in Lake Circuit Court. On June 24, 1974, Judge Moody ordered the Respondent's appearance

stricken in that the Respondent had previously represented Klaas and now was representing parties with adverse interests in litigation involving the same subject matter.

In view of the above findings of fact, this Court now concludes that Klaas employed the Respondent's law firm in numerous matters, paid the firm $7,000 and was represented by the firm until its dissolution in 1973. It is also our conclusion that the Respondent charged his former client with misconduct in the same lawsuits his firm participated in prior to dissolution of the firm, that the Respondent filed a lawsuit against a former client concerning matters identical to those involved in his former firm's representation, and that the Respondent used documents furnished by Klaas upon which to predicate his allegations of fraud. Accordingly, this Court now further finds that the Respondent revealed confidences, used confidential information for his personal advantage, violated a disciplinary rule, engaged in conduct which adversely reflected on his fitness to practice law, and, by filing a lawsuit against Klaas, attempted to use confidences to the disadvantage of a former client in violation of the Code of Professional Responsibility as charged under Counts III and V of the amended verified complaint.

In Count VI of the amended complaint the Respondent is charged with attempting to solicit a potential client, Russell C. Hooper. This alleged conduct is prohibited by Disciplinary Rule 2-103 (A). The Respondent is further charged under this Count with violating a disciplinary rule [1-102 (A) (1)] and engaging in conduct which adversely reflects on his fitness to practice law [1-102 (A) (6)].

After review of the pleading filed in this cause, this Court now finds that on March 14, 1973, Crumpacker wrote Russell C. Hooper and stated that there was a need for someone to step in for Dedelow and combat the fraud that was being perpetrated on the taxpayers of Lake County. In response, Hooper wrote the Respondent and indi-

cated that he knew nothing of this matter. Hooper declined to participate in this litigation. It appears that this second letter was written in Reed and Abrahamson's office, but signed by Hooper.

These findings of fact establish that the Respondent attempted to solicit legal business. This conduct violated Disciplinary Rules 2-103(A), 1-102(A)(1), and 1-102(A)(6) as charged under Count VI of the amended complaint.

Counts XI, XII, and XIII of the amended complaint involve the Respondent's conduct during the Klaas litigation noted above under Counts III and V. In Count XI the Respondent is charged with publicly disseminating a pleading containing improper extrajudicial matters. He is specifically charged under the Code of Professional Responsibility with violating the following Disciplinary Rules:

1-102(A)(1)—Violating a Disciplinary Rule;

1-102(A)(5)—Engaging in conduct prejudicial to the administration of justice;

1-102(A)(6)—Engaging in conduct which reflects adversely on his fitness to practice law;

7-107(G)(1)—Making an extrajudicial statement in a pending civil case relating to evidence regarding the occurrence or transaction involved;

7-107(G)(2)—Making an improper extrajudicial statement concerning the character, credibility or criminal record of a party, witness or prospective witness;

7-107(G)(4)—Making an improper extrajudicial statement regarding his opinion as to the merits of claims by a party; and

7-107(G)(5)—Making an improper extrajudicial statement relating to a matter reasonably likely to interfere with a fair trial of the action.

We have examined all matters submitted in this cause and now find that during the Klaas litigation a motion was filed to strike the Respondent's appearance. On June 10, 1974, Respondent filed a one hundred page brief in support of his objections directed toward the Motion to Strike and sent a copy of such brief to over 80 attorneys and judges not associ-

ated with the Klaas case. The following matters, which are indicative of the contents of the brief, have been taken from its table of contents:

III. STATEMENT OF FACTS _____11-31

A. Description Of the Actual Owners and Promoters of Apple Valley Village, To-Wit: Dannie's Mobile Homes, Inc. And Its Individual Officers and Directors _____11-15

B. The Connellys, The 2700 Demonstrators, and The Citizens, Voters and Taxpayers of Lake County, Indiana, Won A victory Before The Board Of County Commissioners On The Evening Of May 10, 1971. The Board of County Commissioners Voted Against the Rezoning of the Dinwiddie Farm (Apple Valley Village) _____15-16

C. Hammond Attorney Kenneth D. Reed, County Attorney Joseph L. Skozen and Assistant County Attorney William J. Muha Perpetrate A Vicious Fraud On The Lake Superior Court Room No. 5, The Connellys, the 2700 Remonstrators, And The Citizens, Voters and Taxpayers Of Lake County In Procuring A Collusive Decree on August 6, 1971. Purporting To Rezone Apple Valley Village in Circumvention Of The May 10, 1971 Decision Of The Board of County Commissioners _____16-21

D. The Connellys, 2700 Remonstrators and the Citizens, Taxpayers And Voters Are Surprised To Learn That The Hammond Superior Court, Room No. 5, In Cause No. 571-418 Has "Rezoned" The Dinwiddie Farm By Declaratory Judgment. They Make A Further Effort To Get Relief— This Time Through Resort To The Courts _____21-23

E. Flushed With Two Quick Knock-Out Victories Over Ruman and Hungry For Cash, Reed And Muha Make A Five Million ($5,000,000) Boner In Urging Dannie's Mobile Homes, Inc. to Proceed, Full Steam Ahead, With The Building Program. They Know That They Can Win Before Judge Pivarnik In The Third Suit. They Discount And Ignore The Potential Round House Punch of Robert Berger, Ruman's Law Man, In Appeal Work. They Make The "Drop" For Klaas And The Secret Beneficiaries of Trust No. 1653 _____23-26

F. Much To The Further Suprise of Reed, Skozen, Muha, Klaas, The Secret Beneficiaries of Trust No. 1653 and Dannie's Mobile Homes, Inc., Et Al., Saul I. Ruman And Robert Berger, His Law Man, Win A Smashing Victory For the 2700 Remonstrators, Citizens, Taxpayers And Voters, In The Indiana Court of Appeals On June 29, 1972. The Sell-

646

Out Price For Saul I. Ruman And Class Plaintiffs Bryant, Jr., Paul Hoffman And Martin Hoffman (Under Negotiation Since November 2, 1971) Sky-Rocketed Accordingly _____ 26-29

G. Ruman, Reed, Skozen and Muha Make A Unique Deal. In Selling Out The Interests Of The 2700 Remonstrators, Citizens, Taxpayers and Voters, And To Exculpate Themselves From Blame In Quadrupling The Size Of The Contemplated Mobile Home Park, They Work Out A Scheme To Make The Indiana Court of Appeals And The Lake Circuit Court At Crown Point The "Scapegoats" for The Project _____30-31

IV. UNPRECEDENTED SCHEME TO USE INDIANA COURTS AS A WEAPON TO DESTROY RIGHTS AND INTERESTS OF THE 2700 REMONSTRATORS, AND THE CITIZENS, VOTERS AND TAXPAYERS OF LAKE COUNTY _____31-37

V. TO BRING THE PLAN AND SCHEME TO FRUITION, IT WAS MANDATORY THAT SAUL I. RUMAN AND THE THREE CLASS PLAINTIFFS, JOHN BRYANT, JR., PAUL HOFFMAN AND MARTIN HOFFMAN, VIOLATE THEIR FIDUCIARY DUTIES AS TRUSTEES (CLASS PLAINTIFFS) _____37-45

VI. BY MAKING AN UNCONSCIONABLE DEAL WITH KENNETH D. REED, COUNTY ATTORNEY JOSEPH L. SKOZEN AND ASSISTANT COUNTY ATTORNEY WILLIAM J. MUHA TO UPHOLD AND PROTECT THE COLLUSIVE "DECLARATORY JUDGMENT," PURPORTING TO REZONE APPLE VALLEY VILLAGE, SAUL I. RUMAN AND THE CLASS PLAINTIFFS, JOHN BRYANT, JR., PAUL HOFFMAN AND MARTIN HOFFMAN, BECAME PARTIES TO THE PLAN, SCHEME AND CONSPIRACY JUST AS THOUGH THEY WERE PRINCIPALS IN THE BEGINNING _____46-49

VII. SAUL I. RUMAN JOINS WITH KENNETH D. REED, HAROLD ABRAHAMSON AND ASSISTANT COUNTY ATTORNEY WILLIAM J. MUHA IN "COVER-UP" ACTIVITIES IN THE LAKE CIRCUIT COURT WITH THE PURPOSE OF BRINGING ABOUT A DISMISSAL OF THE CONNELLYS' ACTION IN THE LAKE SUPERIOR COURT IN HAMMOND _____49-54

VIII. SAUL I. RUMAN'S "MOTION TO STRIKE OWEN W. CRUMPACKER'S APPEARANCE ON BEHALF OF CONFLICTING PARTIES, TO STRIKE CERTAIN LETTERS AS FALSE AND IMPROPER AND TO FIND

OWEN W. CRUMPACKER IN CONTEMPT OF COURT"
IS SIMPLY ONE FURTHER OVERT ACT IN THE
PLAN, SCHEME AND CONSPIRACY HERETOFORE
DESCRIBED. THE CONNELLY'S AMENDED VERI-
FIED OBJECTIONS TO THE RUMAN MOTION POINT
OUT WHY HON. JAMES T. MOODY SHOULD NOT
HANDICAP FULL EXPOSURE OF AN UNPRECE-
DENTED FRAUD ON THE INDIANA COURTS __54-99

The above findings establish that the statements contained in the brief were extrajudicial and that such extrajudicial matters were intentionally directed by the Respondent to members of the Bench and Bar, who had no relationship to the pending litigation.

It appears that Respondent's intent was to have such matter communicated generally among the Bench and Bar. Sending such a document, to over 80 individuals reasonably suggests an intent for public dissemination and we conclude that these extrajudicial statements were made in such a manner that a reasonable person would expect them to be disseminated by means of public communication.

Accordingly, this Court holds that Respondent made extrajudicial statements in a pending civil case concerning evidence regarding the occurrence or transaction involved, the character or credibility of parties, witnesses and prospective witnesses, his opinion as to the merits of claims and concerning matters reasonably likely to interfere with a fair trial. In so doing Respondent violated the Disciplinary Rules 7-107(G) (1), (2), (4), and (5), 1-102(A) (1), (5), and (6).

In the Klaas litigation, as noted before, Judge Moody struck Respondent's appearance by reason of a conflict of interest. The Respondent thereafter wrote two letters excoriating Judge Moody. His letter of July 1, 1974, to Judge Moody forms the basis of Count XII; the one of August 8, 1974, to Richard Grabham, Count XIII. Both letters were released to the press. Together with the general charges of misconduct

under Disciplinary Rule 1-102(A)(1) and (6), the Respondent is specifically charged with violating Disciplinary Rule 8-102(B) which provides:

"A lawyer shall not knowingly make false accusations against a judge or other adjudicating officer."

After reviewing all matters submitted herein, we now find that on June 24, 1974, Judge Moody, as Special Judge in the Klaas case, entered an order finding that the Respondent was engaged in a conflict of interest by attempting to represent the Plaintiffs (Connellys) in this litigation; Judge Moody ordered Crumpacker's appearance stricken. The judge did not release a copy of his order to the press; however, the press obtained the order and published such findings. On July 1, 1974, Respondent wrote Judge Moody a letter in which the Respondent accused Judge Moody of deliberately covering up gross fraud and publishing the order, among other accusations. Respondent then petitioned for Judge Moody to be joined in the disciplinary proceeding against the Respondent. Judge Moody replied with a 10 page response. The Respondent countered with a 17 page letter to Richard Grabham, then Executive Secretary of the Disciplinary Commission, generally suggesting that Judge Moody was engaged in the conspiracy taking place, that he lived under a rock, was somehow associated with the Watergate scandal, was in Reed's vest pocket, and was otherwise a corrupt public official. Respondent made attempts but wholly failed to prove any of the acts of impropriety alleged in his letters. The Respondent furnished copies of his correspondence to the news media in both instances.

In light of the above facts we find that after receiving an unfavorable ruling from Judge Moody, the Respondent launched an unmitigated assault on Judge Moody's character and integrity. The accusations contained in his letters are totally unreasonable and false. The Respondent should have known and probably did know such accusations were false. Thus, we conclude that Respondent

engaged in the misconduct charged under Counts XII and XIII and violates Disciplinary Rules 8-102(B) and 1-102(1) and (6).

The remaining counts in the amended complaint are not associated with the Dedelow and Klaas litigation. The charges of alleged misconduct under the remaining counts generally relate to the Respondent's course of conduct in various lawsuits, demonstrated manner of representation, and proclivity to use a legal proceeding as a vehicle to punish his enemies.

Count XIV charges Respondent with making improper statements during a closing argument in Hammond City Court. He is alleged to have improperly argued that Special Judge Stanish had a connection with the Police Department and that the prosecution of this case against a railroad was politically motivated. The Respondent is charged with violating the following provisions of the Code of Professional Responsibility:

D.R. 1-102(A)(1)—Violating a disciplinary rule;

D.R. 1-102(A)(4)—Engaging in conduct involving fraud, deceit, dishonesty or misrepresentation;

D.R. 1-102(A)(5)—Engaging in conduct which is prejudicial to the administration of justice;

D.R. 1-102(A)(6)—Engaging in conduct which reflects adversely on his fitness to practice law;

D.R. 7-106(C)(1)—While appearing before a tribunal, alluding to a matter he has no reasonable basis to believe is relevant or that will not be supported by admissible evidence;

D.R. 7-106(C)(6)—During the Course of a proceeding, intentionally or habitually violating an established rule of procedure or evidence; and

D.R. 8-102(B)—Knowingly making a false accusation against a judge.

This Court has examined all matters presented herein and now finds that during May, 1973, John Stanish sat as Special Judge in *State* v. *Gallison*. The Respondent represented the defendant who was charged under a state statute for improp-

erly blocking an intersection; Gallison was a railroad engineer. During his final argument in this case, the Respondent stated that the prosecution was politically motivated; that the arresting officer was under the influence of the prosecutor and Court and had to follow instructions in order to advance within the police department; that he (arresting officer) was taking his orders from the Court, which was a police court; that the defense was stuck with the Special Judge; and that the judge's law partner's father was a police officer. No evidence was introduced by Respondent to support these allegations.

Special Judge Stanish called a recess and admonished the Respondent, during which the Respondent continued to shout at the Judge.

The above findings establish that Respondent made statements which he had no reason to believe were supported by admissible evidence. He intentionally and habitually violated an established rule of procedure and knowingly made false accusations against a judge. Respondent's conduct is a misrepresentation in a court of law, is prejudicial to the administration of justice, reflects adversely on his fitness to practice law and is violative of the Disciplinary Rules. Accordingly, this Court concludes that Respondent did engage in the misconduct charged under Count XIV of the amended complaint and did violate the Disciplinary Rules charged therein.

We will next review the charges under Count IV(A) and (B). This count grows directly out of the dissolution of the firm of Crumpacker, Abrahamson and Reed. The Respondent is charged with refusing to return files to clients after they had indicated a desire to be represented by his former partners. Specifically, the Respondent is charged with violating a Disciplinary Rule, engaging in conduct prejudicial to the administration of justice, and in engaging in conduct which adversely reflects on his fitness to practice law in violation

of Disciplinary Rule 1-102(A)(1), (5) and (6). Additionally, under Count IV the Respondent is charged with violating Disciplinary Rule 9-102(B)(3) and (4) which provide that a lawyer shall maintain complete records of clients' funds, securities and other properties, render appropriate accounts, and promptly pay or deliver to the client, as requested, funds, securities or other properties to which the client is entitled.

After reviewing all matters submitted in this cause, this Court now finds that Kenneth Reed while a member of the firm, was attorney for Robert Croner during Mr. Croner's life. Mr. Croner owned a meat market. When Croner died in September, 1972, Mrs. Croner employed the firm to handle the estate; she gave to Reed tax records, business records, insurance policies, titles and personal checks. When the Crumpacker firm dissolved in 1973, Reed did not take the Croner file with him.

In April, 1973, in order to prepare tax returns, Mrs. Croner and her accountant attempted to get the records which had remained under Respondent's control in the firm's premises. They made an appointment with the Respondent, waited one hour, but he did not appear. She returned the next day with her son and again the Respondent did not show. During the summer of 1973, Mr. Lloyd Ahlf contacted the Respondent on three different occasions attempting to get the Croner file for Mrs. Croner.

In January 1974, Mrs. Croner and her son met with the Respondent. Mrs. Croner advised the Respondent that she came to pick up her records. Respondent instructed her to be quiet and listen to him. When she advised him that she came for a purpose, the Respondent told her and her son to "Get the hell out." The Respondent then had his secretary bring in the records and tried to tell Mrs. Croner that he would like to settle the estate. Respondent pulled several matters out and started reading them. Mrs. Croner told the respondent that she wanted Reed to represent her. Finally, the

Respondent instructed Mrs. Croner and her son to leave. He walked them to the elevator and was reported to have said "You can get the hell out of here. Stay out of here. You will never get your records."

Thereafter, Mrs. Croner's accountant had correspondence with the Respondent in an attempt to get the records. The Respondent has never turned the records over to Mrs. Croner.

During the hearing of this cause the Respondent testified that he never had Mrs. Croner's file. He had the office file, but not her file. He did not give her the file because he felt she did not have the proper attitude and because he believed there may have been an unreported gift of certificates of deposit, given in contemplation of death. The Respondent added that this may have created liability on his part and he had an obligation to see that the taxes were properly reported. His proof of this allegation was extremely weak and speculative.

As a consequence of not having the business and personal records, the personal files of Mr. Croner had to be reconstructed. The time involved in obtaining duplicate documents cost the estate penalties and interest in the amount of $1,275.

The Respondent's testimony is specious, at best, and in great part inconsistent. He testified that he did not have Mrs. Croner's file, but he did have an office file. He said he did not have any personal record, but then states that he refused to turn over the file because he noted certain unreported transfers of certificates of deposit.

On the other hand, the testimony of the Disciplinary Commission's witnesses was consistent and there appears to be no motivation for prevarication on their part.

In light of the findings and considerations set out above, we conclude that the Respondent acted in a manner which was prejudicial to the administration of justice and which reflected adversely on his fitness to practice law. This constitutes a violation of Disciplinary Rules 1-102(A)(1), (5), and (6).

We further conclude that the findings establish that the Respondent did not provide an adequate account of the properties in his control nor deliver such records as requested. This conduct is violative of Disciplinary Rules 9-102 (B) (3) and (4).

As to Count IV (B), this Court now finds that Kushner and Gersack were property owners involved in a condemnation proceeding. In 1968 they retained the Crumpacker firm to represent them in such litigation. Thereafter, the State paid in $312,435 and the plaintiffs on petition withdrew this amount pending the resolution of the condemnation litigation. Under the contingent fee agreement drafted by Reed, the firm was to receive 29% of the recovery. When the money was withdrawn, the Crumpacker firm was given $70,000. The money was deposited in the firm's account and eventually distributed. Additionally, the clients had paid $6,000 to $7,000 for court costs. The Respondent personally agreed to hold the clients harmless for any loss on the withdrawal bond posted. In 1973, Kushner made ten to twelve attempts to contact the respondent relative to the delay in this litigation. In the spring of 1974, Kushner, Gersack and Respondent finally had a meeting. The clients asked for an accounting; they were not satisfied as to what they received. Thereafter, they informed Respondent in writing that they wanted their file returned as well as their money. The Respondent did not return the file or money. Instead, the Respondent filed a petition for leave to withdraw his appearance in the condemnation proceeding which had been venued to the LaPorte Circuit Court. In March 1975, the LaPorte Circuit Court granted his petition to withdraw and ordered him to return all files, papers, and unearned fees. The Respondent failed to do so and was found in contempt.

The findings set out above clearly establish that the clients were entitled to their file when they made their written

demand. Respondent's refusal to do so constitutes misconduct and is violative of Disciplinary Rule 9-102(B)(3) and (4). Such conduct is prejudicial to the administration of justice and adversely reflects on Respondent's fitness to practice law, in violation of Disciplinary Rule 1-102(A)(1), (5) and (6).

Counts VII, VIII, IX and X concern the Respondent's outbursts during proceedings.

Under Count VII of the amended complaint the Respondent is charged with verbally and physically assaulting attorney William Spangler on or about May 6, 1971, in the library and foyer of the Lake Superior Court in Hammond.

Having reviewed all matters submitted in this cause, this Court now finds that on May 5, 1971, Spangler met with the Respondent in a settlement conference in the Hammond Courthouse. Also attending this conference were Jack and Helen Herschbach and attorneys G. Edward McHie and Edward Glendening. The case in question involved Herschbach trust funds.

During the course of the conference Respondent became involved in a confrontation. The commotion was initiated by Respondent who grabbed Spangler when he was attempting to leave. These findings demonstrate conduct which reflects adversely on Respondent's fitness to practice law and is thusly violative of Disciplinary Rule 1-102(A)(1) and (6) as charged in the complaint.

Under Count VIII the Respondent is charged with calling Attorney Edward McHie, among other things, a "little yellow son-of-a-bitch" during the course of the taking of a deposition. Specifically, the Respondent is charged with violating a Disciplinary Rule [1-102(A)(1)], engaging in conduct prejudicial to the administration of justice [1-102(A)(5)], engaging in conduct which reflects adversely on his fitness to practice law [1-102(A)(6)], and engaging in undignified or discourteous conduct degrading to a tribunal [7-106(C)(6)].

This Court has examined all matters presented herein and now finds that during the course of the taking of Mr. Edward Schaeffer's deposition in 1970, the Respondent called opposing counsel, McHie, on the record dense, a culprit, so lacking in mental capacity as not being able to find his way to the toilet, too big for his britches, a skunk, a jack-leg, lazy, tricky, unfit to practice law, and a little yellow son-of-a-bitch. Respondent apologized to McHie on the next day. In November 1974, Respondent wrote McHie and amended his remarks to substitute "ring-tail" for "little yellow."

Had the conduct of Respondent been committed after the effective date of the Code of Professional Responsibility, the evidence presented in this cause would be sufficient to support a finding of misconduct as charged under Count VIII of the amended complaint. This Court, however, has found that the incident in question took place prior to March 8, 1971, the effective date of the Code. Since the amended complaint did not charge the Respondent with misconduct under predecessor provisions, we now find for the Respondent under Count VIII.

In Count IX the Respondent is charged with directing discourteous and derogatory remarks toward opposing counsel and the Plaintiff during the course of a hearing before Judge Pinkerton. As under Count VIII, the Respondent is charged with violating Disciplinary Rules 1-102(A) (1), (5), and (6) and 7-106(C) (6).

This Court following review of all matters submitted in this cause now finds that on March 24, 1974, before Judge Pinkerton, during a hearing on a protective order, the Respondent directed the following remarks and others toward opposing counsel, Johnson and/or the Plaintiff, Winslow Van Horne: (Toward Johnson) : "Now if your Honor isn't going to cover him up, fine, kiss him off, send him back to the country club, let him get up on a bar stool and continue. '. . .' there he could find better people to argue with as your Honor

is aware"; (Toward Johnson) : ". . . a young man who leaves the bar stool out of the men's grill. . . ."
(Toward Johnson) : ". . . this little pipsqueak who couldn't make a living except for Nipsco"; (Toward Johnson) ". . . he couldn't make a living if Don Mitchell gave him a pocket full of cash."; (Toward Van Horne) : ". . . better get back over and sober up"; (Toward Van Horne) : "Van Horne, you go back to Auburn and get drunk and get your god damned liver. . . ."

These remarks were improper, but more than that these were direct, personal, insulting references directed toward opposing counsel and the Plaintiff, who happened to be an attorney. Standing alone, this one incident probably would not be sufficient to warrant serious discipline. However, this one Count does not stand alone; Respondent's behavior in the case noted under this count appears to be indicative of his method of operation. When reviewing this record, it is evident that in many instances the Respondent browbeats, shouts at and attempts to intimidate his opponents. His tirades are, at times, irrational and his rage appears to be uncontrolled. Ethical consideration 7-37 has application in the present circumstances :

> EC 7-37 In adversary proceedings, clients are litigants and though ill feeling may exist between clients, such ill feeling should not influence a lawyer in his conduct, attitude, and demeanor towards opposing lawyers. A lawyer should not make unfair or derogatory personal reference to opposing counsel. Haranguing and offensive tactics by lawyers interfere with the orderly administration of justice and have no proper place in our legal system.

In light of the above considerations, we now conclude that the Respondent violated Disciplinary Rules 7-106 (C) (6) and 1-102 (A) (1), (5), and (6), as charged under Count IX of the amended complaint.

Count X charges the Respondent with making insulting remarks toward opposing counsel, John Patrick McQuillan, and the witness during the taking of a deposition. Respondent is

charged with the same violation of the Code as under Counts VIII and IX, i.e., violation of Disciplinary Rules 7-106(C)(6) and 1-102(A)(1), (5), and (6).

We now find that the incident involved in this Count was the deposition of Henry Herschbach, an 82 year old man. During such deposition, which lasted eleven days, the Respondent shouted at the witness, pointed his finger in the witness' face and verbally abused the opposing counsel and the witness. The Respondent frequently accused opposing counsel of corruption, "hanky-panky", scheming to convert and steal funds and documents, falsification of records, swindling, suborning perjury, compounding a felony, dishonesty and evasive conduct. On the final day, during the course of the deposition and in the presence of the deponent, the deponent's wife, the plaintiff, and others, the Respondent told opposing counsel, John P. McQuillan, on three occasions, that Respondent was going to stick or put McQuillan's head in a "toilet bowl." During the course of the said deposition the Respondent also accused the deponent of dishonesty, lying, corruption, conversion, embezzlement, and other crimes. A number of these accusations were accompanied by Respondent pointing at the eighty-two year old witness, shaking his hands and fingers at the witness, and shouting at the witness.

In light of the above findings, this Court now concludes that the Respondent engaged in conduct which adversely reflects on his fitness to practice law and which was prejudicial to the administration of justice. Accordingly, we now further find that the Respondent violated Disciplinary Rules 1-102(A)(1), (5), and (6) as charged under Count X of the amended complaint.

Under Count X, as noted above, the Respondent is also charged with violating Disciplinary Rule 7-106(C)(6), which prohibits undignified and discourteous conduct when appearing in a professional capacity before a tribunal. The Respondent's misconduct under this count transpired during the

course of a deposition. The issue thusly becomes whether or not conduct during the course of a deposition is conduct "before a tribunal" under the above-cited Disciplinary Rule. This rule is predicated on the need for an orderly procedure to resolve disputes. Such procedure envisions spirited debate and intense examination. But an orderly process of dispute resolution is not possible unless there is respect for the procedures and an attempt to work within an established framework. Discourteous and undignified behavior detracts from the orderly process of dispute resolution and clearly falls outside an acceptable level of attorney conduct. It appears insignificant whether such conduct occurs during the taking of a disposition or during the examination of a witness at trial. Both instances require an orderly process and mandate customary courtesies. Both a deposition and a trial are governed by the rules of Court and are under the auspices of the Court. Accordingly, we now find that the Respondent's conduct during the course of the Herschbach deposition violated Disciplinary Rule 7-106(C)(6), as charged under Count X of the amended complaint.

Under Count XV the Respondent is charged with filing a lawsuit alleging fraud and conspiracy when such assertion had been previously litigated in Federal Court and found to be a groundless claim. It is asserted in the complaint that the Respondent pursued this course of litigation as a means to annoy and harass the attorneys opposing him. The Respondent is charged with violating the general provisions of Disciplinary Rules 1-102(A)(1), (5), and (6) and Disciplinary Rule 7-102(A)(1) which prohibits deliberately filing a suit for a client when it is obvious that such action would serve merely to harass another.

Having reviewed all matters submitted in this cause, this Court now finds that in May 1974, the Respondent prepared and filed a complaint in Lake Superior Court on behalf of Woodmar Realty Company. He was authorized by his client to do so. Named as defendants, among others, were Walter

McLean and Herschel Davis. These individuals were the trustee and trustee's attorney in a bankruptcy proceeding involving Woodmar Realty. Such previous proceeding was commenced in 1941 and concluded in 1969 with the trustees being discharged. Also named as defendants were Edmond Leeney, Charles Levin, and Floyd Murray who had represented interested parties adverse to the Respondent during the course of the bankruptcy proceeding.

During the course of the proceeding in Federal Court, the Respondent attempted to assert fraud on the part of McLean and Davis. The Respondent filed an amended complaint which was dismissed. On appeal, the United States Court of Appeals, Seventh Circuit, affirmed the decision of the district Court. *Woodmar Realty Company* v. *McLean,* (1961) 294 F.2d 785. Additionally, the Court of Appeals commented on the Respondent's conduct in such matter.

> . . . This opinion might rest there and the judgment be affirmed without further discussion, were it not for the pervading impression gathered from this record that the removal petition constitutes an attempt by appellant's attorney, Mr. Crumpacker, to harrass appellees in the continued performance of their official functions and a near-contemptuous abuse of the processes of a federal court. (294 F.2d at 786)
>
> There is, however, more involved here than the time element, namely, a vituperous tendency of counsel to read some heinous motive into the acts of anyone who dares to oppose him and of every judge who rules adversely to him. . . . (294 F.2d at 792)
>
> . . . We think that fact of timing is significant, and it is certainly consistent with the pattern which the record reveals of charging both the dead and the living with fraud whenever an adverse ruling is contemplated or becomes a reality. (294 F.2d at 792)
>
> Because we are convinced that the record in this case presents a contemptible, if not contemptuous, abuse of the legal processes of a federal court, we have dwelt at length upon a historical resume of the record facts as they have come to our attention. We did that advisedly in order that there may be no mistake that we are cognizant of the nature and severity of the question with which we deal. We find

a sordid picture of the repeated use of ill-founded charges of fraud as a trial tactic which is foreign to established concepts of honest and ethical advocacy. We want it clearly understood that repetition of that practice as disclosed by this record will not be tolerated in the future. (294 F.2d at 794-5)

The proceeding filed in the Lake Superior Court was challenged in Federal District Court. In reversing a decision to the contrary, the Court of Appeals, Seventh Circuit, ultimately held that the general principles of *res judicata* precluded the Respondent from relitigating the issue determined in the prior federal proceeding. *Samuel C. Ennis and Company Inc., et al.* v. *Woodmar Realty Company, et al.*, 542 F.2d 45. This Court now takes judicial notice of such decision.

The above findings of fact establish that upon an examination of the history of this litigation a very reasonable inference can be drawn that Respondent's motive in filing this suit in Lake Superior Court was to harass.

Whether or not the Respondent was authorized to file the suit in Lake Superior Court does not appear crucial under Disciplinary Rule 7-102(A)(1); this provision makes no exception for an attorney who has a client's authority. Disciplinary Rule 7-102(A)(1) precludes an attorney from filing harassing litigation.

In light of the above considerations this Court concludes that Respondent filed a suit and took action on behalf of his client when it was obvious that such suit would only serve to harass and maliciously injure others; that such conduct is a violation of Disciplinary Rule 7-102(A)(1). Respondent's actions relative to this count are further violative of the provisions of Disciplinary Rules 1-102(A)(1), (5), and (6).

Counts XVI and XVII emanate from the Respondent's conduct in the case of *Dubois* v. *Union Trust Company of Indianapolis, et al.* It is charged that on the day of trial of this cause, the Respondent asked for a continuance to substitute

the trustee in bankruptcy as the real party defendant. The Respondent had known for years that the trustee was the real party in interest, but waited until the last day. For such conduct the Respondent is specifically charged under Count XVI with violating the general provision of Disciplinary Rules 1-102(A)(1), (5), and (6), and Disciplinary Rule 7-102(A)(1) which prohibit taking an action merely to harass another. Special Judge West indicated that because of the delaying tactic being employed he would impose a sanction against the Respondent. Crumpacker then commented in the record that this was a lot of "bunk" and that he would "waltz" Judge West to the Disciplinary Commission if the sanction were allowed to stand. The Respondent is charged under Count XVII with undignified or discourteous conduct before a tribunal in violation of Disciplinary Rule 7-106(C)(6), and general violations of the Code of Professional Responsibility, to-wit: Disciplinary Rules 1-102(A)(1) and (6).

Upon examination of the matters submitted in this cause, we now find that on October 12, 1973, the Respondent, in a matter that had been pending for a number of years, moved to substitute parties. The plaintiff objected. The trial judge indicated that the change in parties had been known to defense counsel for a long time prior to the trial date and no attempt had been made to substitute and further indicated an inclination to impose sanctions on defense counsel, Respondent. The Respondent then stated in open court, "that's the most abusive order I have ever heard a Judge emit from the stand, I, I'm going, if that order stands, we're going to take it up with the Disciplinary Commission and we'll, and I represent to you that as an officer of this Court you're going to have to account to the Commission for any attempt to assess attorneys fees against me and for these, and, do you understand? And you're going to get, we'll waltz you down there before the Commission as quickly as you can get there, do you understand?" Respondent added "and even faster. The idea of that kind of bunk."

In light of the above findings, this Court concludes that the acts of the Respondent in the *Dubois* v. *Union Trust Company of Indianapolis* case constituted undignified and discourteous conduct before a tribunal. Accordingly, this Court now finds that the Respondent violated Disciplinary Rules 1-102(A)(1) and (6) and 7-106(C)(6) as charged under Count XVII of the amended complaint. We further find, however, that the evidence is insufficient to support a finding of misconduct as charged under Count XVI of the amended complaint.

Under Count XVIII of the amended complaint the Respondent is charged with violating Canon 11 of the American Bar Association's Canons of Professional Ethics and under Count XIX of the amended complaint the Respondent is charged with violating Disciplinary Rules 1-102(A)(1), (5), and (6), 7-101(A)(3) and 9-102(B)(4). Both of these Counts concern the internal financial affairs of the Respondent's former law firm. We anticipate that the underlying issues in these charges will be resolved in the final settlement of the law firm obligations and assets. We find the evidence of record insufficient to support a finding of professional misconduct under Counts XVIII and XIX of the amended complaint.

It now becomes the duty of this Court to impose an appropriate disciplinary sanction by reason of the above-cited acts of misconduct. As this Court has noted on several previous occasions, in reaching such decision many factors are considered, such as the nature of the violation, the specific acts of misconduct, this Court's responsibility to preserve the integrity of the Bar, and the risk, if any, to which we will subject the public by permitting the Respondent to continue in the profession or be reinstated at some future date. *In re Vincent*, (1978) 268 Ind. 101, 374 N.E.2d 40; *In re Tabak*, (1977) 266 Ind. 271, 362 N.E.2d 475; *In re Murray*, (1977) 266 Ind. 221, 362 N.E.2d 128.

In the present case, the evidence presents a particular course of conduct totally contrary to the effective administra-

tion of justice and all standards of professional conduct. The acts set out under the various counts wherein this Court has found misconduct create a picture of a vicious, sinister person, tunnel-visioned by personal pique, and willing to forego all professional responsibilities which conflict with acts of preconceived vengeance on personal enemies. The Respondent's wrath has no bounds and his ire affixes to any and all persons who oppose him, even if such opposition is in a professional capacity. The Respondent verbally insults his adversaries at a personal level. Professional advocacy is totally submerged into vitriolic obloquy and all of the Respondent's adversaries, professional or personal, immediately become part and parcel of a grand fraud or conspiracy being perpetrated on some party for whom the Respondent asserts representation.

The course of conduct demonstrated by the Respondent has no place within the contemporary practice of law. A lawyer owes an obligation to his client to provide the best representation possible, an obligation to the legal profession to strive for justice, and an obligation to himself to meet the demands of his profession. When a lawyer loses sight of his purpose and uses the legal system for personal vengeance, he fails in his obligations to his client, profession, and self. In the present cause the Respondent used information gained in the course of professional services to form the basis of a suit against his former client; he employed the legal system as a vehicle for personal vengeance; and in the end the Respondent abandoned any standard of professional behavior. This conduct, unfortunately, represents a total failure of all obligations.

In light of the above considerations, this Court is forced to conclude that the strongest sanction available under the Constitution of the State of Indiana must be imposed to preserve the integrity of the legal profession and to protect the public from future acts of misconduct as found in this case. It is therefore ordered that by reason of the misconduct found in

this cause the Respondent be, and he hereby is, disbarred as an attorney in the State of Indiana.[1]

Costs of these proceedings are assessed against the Respondent.

Pivarnik, J., not participating.

NOTE.—Reported at 383 N.E.2d 36.

---

1. This Court finds it imperative to comment on Respondent's behavior during the lengthy hearing of this matter. His outbursts, insults toward witnesses and opposing counsel, and insinuations of collusion on the part of the Commission and its staff, went far beyond any measure of effective advocacy. The record is replete with instances of such conduct demonstrating a total disregard for the proceeding itself, and courtroom decorum generally. The following excerpts are but a few examples:

Tr. 127; (I)f the Court undertakes to listen to this Commission that it isn't interested in maintaining the honorable integrity of the profession, but is interested rather in attempting to smear and destroy a reputation of a lawyer, then I say that is the way to let them foreclose any enquiry into this case."

Tr. 139; To witness Donnersberger: "You can remember the magic words that are in the Commission's foolishness?" Hughes: "Your Honor, I object to the representations Mr. Crumpacker is making about the Commission." Respondent: "Why don't you leave."

Tr. 141; ". . . (A)s far as I am concerned, the Court (J. West) did nothing but drink himself to oblivion at the Tallyho down in the outskirts of Peru and conduct night court for the Bunker Hill Academy. And he didn't do a damn thing except get drunk and get thrown out of office when he ran again."

Tr. 175; "My question was did I ask you (Donnersberger) Mr. Courtesy, for the benefit of the smirking people of the grievance committee who are, in my opinion, eighteen karat H.A.'s."

Hughes: "Your Honor, I don't think we should have to sit here and be subjected to that ————."

Crumpacker: "I know you don't, you're too dumb. But I don't like these smirks at my back. When smart alecks make some statements. . . ."

Tr. 218; (When Respondent's Motion to Separate Witnesses was denied) "We are going to seek redress against these men and it's going to be a solid lawsuit against them for vicious attacks upon the character and integrity. . . ."

Hughes: "Your Honor, would the record show that when Mr. Crumpacker said a moment ago that he was going to file solid lawsuits that he pointed in the direction of Mr. Hughes and Mr. Stevens and Mr. Grabham."

Tr. 588; "Substantially, the law firm Abrahamson, Reed & Tanasijevich is known in Hammond as Toad, Weasel and Skunk and they have been actively participating under that appellation."

Tr. 771; About Abrahamson: "Well, it's irritating because I know him well enough to know that he couldn't make a living on his own hook. . . . If he is going to sit here, if you won't throw him out, and he should be thrown out of all courts of law, at least he should be admonished not to be passing sweetheart notes to his sweetheart Hughes and Hughes."

Tr. 788; I think that your (Hughes') courtesy couldn't get by in the lowest J.P. Court. When the J.P. Courts are all abolished, why, you will be on the relief rolls. . . ."

Tr. 797; "My defense is based on the truth and I accuse you (Hughes) of falsifying the document that is tendered (Ex. 25—later admitted).

Tr. 987; (During the introduction of Plaintiff's Ex. 27 and objections thereto) "Now, because Mr. Abrahamson is here and directing the travelling road show and gets ahold of Mr. Hughes and says now. . . ."

Tr. 1076; (In reference to witness McQuillan) ". . . I think that he should be horsewhipped and put in jail, that's my opinion."

Tr. 1111; "And Mr. McQuillan deserves more than having his head stuck in a toilet bowl."

Tr. 1114; "Now, if this outfit, this Disciplinary Commission, is permitted to come up and take lawyers apart in pending cases and try to discipline another lawyer because he calls another guy (McQuillan) that swindled his cilent out of about a hundred thousand dollars in the course of a deposition that he's been evading, why, I say, the Disciplinary Commission is going to be the most foolish, inappropriate bunch of time wasters, and I think that that's what we are confronted with here. Now, Mr. Hughes is up here only because Abrahamson and Reed who have been here ever since the case started want him here."

Tr. 1118; "He (McQuillan) is as sleek as anybody. You (Hughes) haven't been around."

Tr. 1119; "I think it is a lot of bunk. He (Hughes) doesn't know anything about this case. I happen to know about this case and Mr. Hughes does not."

Tr. 1157; In an objection to question posed to witness Stanish: "And then to come in here with this preposterous bunch of bunk and of a political guy, to come in and try to create something that did not happen in chambers is absolutely ridiculous and we object to any effort on the part of this disgruntled, defeated candidate for public office to blame somebody else. . . ."

Tr. 1161; "This man (Stanish) is beyond abuse. I know him like a book."

"And I think it's an outrage to be here. And you (Hughes) never tried a case and you will never try one and win. . . ."
Tr. 1166; "(Y)ou (to Stanish) don't understand common sense or English."

Tr. 1213; "I represent that he (Spangler) was a swindler and that he was attempting to swindle the Herschbach family."

Tr. 1216; To witness Spangler while on the stand: "There isn't anything you wouldn't do, in my opinion. I think that you have swindled more people than you'll ever know, . . ."

Tr. 2443; "I think that he (J. Moody) should be removed from office, this man, for violating the natural privileges of the citizens and taxpayers of the county."

Tr. 1505; "Rudolph Val Dawson, the syndicate boss. . . ."

Tr. 1519; "That was Reed who was the fellow that had Moody in his pocket, . . ."

Tr. 1520; ". . . I object to the Disciplinary Commission aiding and abetting the continued perpetration of a fraud on the courts through trying to cover the Declaratory Judgment of August 6, 1971, . . ."

Tr. 1540; On direct examination: ". . . my feeling is that he (Mr. Grabham) is a disgrace to the legal profession. He is a disgrace to the court. He is a free-loader and should be eliminated."

Tr. 1558; "The Gestapo has not asked me to produce a single record."

Hughes: "You mean us I guess?"

Crumpacker: "Yes, I am talking about the Disciplinary Commission."

Tr. 1161; Hughes to Crumpacker on direct:

"I wonder if you might at this time read into evidence the names of those persons to whom you sent copies of plaintiff's Exhibit 45."

Crumpacker: "No I'm not going to do it. . . . I will be damned if I am going to become an agent for this foolish neck-tie party by reading into evidence copies of letters that have no bearing on any issues except the vindictiveness. . . ."

Tr. 1876; "I believe that he (Hughes) is a disgrace to the profession." Page 2630; "I assume that you are unmarried, Mr. Hughes, and that you and Mr. Abrahamson have an affinity to each other, drawn to each other, I assume you are a single person."

Hughes: "That is such an outrageous, ridiculous, asinine thing for you to say I can't even . . . you are accusing me of being a fairy?"

Crumpacker: "You wear the shoe that fits you."

Tr. 3090 "Stanish is a, that is, the Judge is a liar. Stanish is a liar."

Tr. 3528; "(Y)ou (Hughes) are the biggest dead beat I have ever known."

Although being admonished on many occasions, he continued in his course of conduct. The Respondent demonstrated a total disregard of the authority vested in the Hearing Officer.

Had this Court not decided to disbar the Respondent for the conduct set forth in the complaint, this matter would be referred again to the Disciplinary Commission for the consideration of new charges based on the Respondent's conduct during these disciplinary proceedings. However, in that the Respondent has been disvarred, the processing of additional charges would be a senseless act.

Nevertheless, this Court deems it necessary to give notice that a disciplinary proceeding is a matter before this tribunal. The rules and courtesies governing an attorney's behavior have application.