In the Matter of William BRIGGS.

No. 1078S235.

Supreme Court of Indiana.

Jan. 13, 1987.

William Briggs, Flora, pro se.

David B. Hughes, Staff Atty., Indianapolis, for the Indiana Supreme Court Disciplinary Com'n.

## DISCIPLINARY ACTION

PER CURIAM.

This Disciplinary cause is before us on a verified amended complaint charging the Respondent with misconduct arising out of his association with an elderly client. This is a companion case to *In re Florence Ann Briggs* [502 N.E.2d 890] which involves Respondent's spouse and law associate. After a joint hearing, the Hearing Officer has submitted two separate, excellently presented, reports in each case. Both Respondent and the Commission have petitioned for review of the ultimate findings of fact and conclusions of law in this case, but the underlying findings of fact as submitted by the Hearing Officer remain, for the most part, unchallenged.

We have reviewed the Hearing Officer's report and all other matters submitted in this cause and now find that the Respondent is a member of the Bar of this state and is, thereby, subject to this Court's jurisdiction. He maintains an office for the practice of law in Carroll County with his spouse, Florence Anne Briggs. Though never under a formal agreement, the Respondent and his spouse held themselves

out to the public as a law partnership operating as Briggs and Briggs.

During the mid 1960's, the Respondent began representing Kate Smoker in a variety of legal matters. Kate Smoker was an elderly childless widow with an estate consisting approximately of a 292 acre farm and $150,000 cash. With the exception of a few small fees, the Respondent did not charge her for his services, and she did not pay him. The two had discussed some sort of a lifetime fee arrangement whereby the Respondent would perform legal services until her death for the sum of $10,000. In 1967 she first mentioned that she wanted the lifetime payment arrangement with the Respondent and, by 1970, there was an understanding that the Respondent would receive $10,000 out of Mrs. Smoker's estate.

The Respondent prepared several wills for Kate Smoker while he represented her. The first will was drafted in 1967 while she was hospitalized; therein the Respondent was left a legacy of $1,000. In 1968, he prepared another will and again the Respondent was to receive a legacy of $1,000. The Respondent was named coexecutor and both he and Florence Anne Briggs were named to serve as attorneys for the estate and for an educational trust created under the residuary clause of the will. The trust was to provide college scholarship grants to residents of Burlington Township who maintain a C-plus average for their college years. This trust provision was part of the earlier wills, however, in this will, Mrs. Smoker directed that an additional clause be added naming Winston Briggs, Respondent's son, the first recipient of the trust. The trust was to accumulate income until Winston Briggs started college and was to be payable to him regardless of his residence or grade average through both undergraduate and professional or graduate school. A 1970 Will drafted by the Respondent again retained the legacy to the Respondent and the trust provisions for Winston. Florence Anne Briggs was named co-executrix, and the trust was modified to provide for three years of accumulation after it was formed, except for payments to Winston, and a special clause to reimburse him for the cost of tuition, books and living expense for his school years.

The creation of the trust was entirely Kate Smoker's idea, which she specifically affirmed by executing a holographic statement contemporaneously with the execution of the 1970 Will. Mrs. Smoker's closest relative was an elderly first cousin; she had no other natural object of her bounty. However, at no time prior to the execution of Smoker's 1970 Will did the Respondent suggest to her the possibility of conflict or that she should obtain independent legal advice as to her will.

In the fall of 1976 Mrs. Smoker's health began to fail and she was hospitalized. During this time she and Respondent discussed arrangements for paying the Respondent a $10,000 fee. Mrs. Smoker desired to bequeath this amount through her will, and the Respondent advised her to consult another attorney. They also discussed the method which was eventually used, a certificate of deposit. On November 8, 1976, Mrs. Smoker called the Respondent to suggest three items of business she wanted to conduct: (a) modify her will with a codicil, (b) nominate the Respondent as her guardian should a guardianship become necessary, and (c) to finalize the $10,000 arrangement for a joint certificate of deposit. On November 9, 1976, Respondent went to Kate Smoker's home with his two secretaries. Present were Smoker's friend, John Johnson and a local banker, Earl Rodkey. Mrs. Smoker executed a $9,000 joint certificate issued to herself and the Respondent which, together with the $1,000 legacy, was to be compensation for past and future services. The Certificate was to be held by Johnson. On the same date Mrs. Smoker also nominated the Respondent as her guardian, should one become necessary. That same afternoon Mrs. Smoker visited her doctor, Dr. Wagoner, who opined that, at such time, she was not competent to manage her affairs because of advanced senility.

Thereafter, Mrs. Smoker's health deteriorated rapidly and, on November 13, 1976, she was admitted to a hospital. It was clear that she could no longer manage her own affairs, and, on November 24, 1976, the Respondent was appointed temporary conservator by the Carroll Circuit Court.

As such, the Respondent became involved in the Smoker farm operation and the renewal of tenant leases. Mrs. Smoker had normally operated her farms on a crop-sharing basis. The Respondent, however, in anticipation of the need for cash for Smoker's medical and nursing costs, changed the practice to cash rentals. On December 13, 1976, Mrs. Smoker was discharged again and her doctor advised the Respondent that her condition was irreversible and that she would permanently require custodial care. Mrs. Smoker, however, made a remarkable recovery, and, after an examination on January 11, 1977, her doctor found her mental impairment to be minimal and her medical and mental problems to be in remission.

It was during this time that she became aware of the guardianship and questioned Mr. Rodkey as to the joint certificate of deposit, professing no recollection about making it. Notwithstanding the recovery, on January 13, 1977, the guardianship was made permanent. The doctor continued to opine that she was incompetent because her recovery was temporary.

During the next month the long-standing relationship between the Respondent and Smoker deteriorated. In late January or early February, 1977, Smoker went to Respondent's office to obtain her lock box key. The respondent correctly refused to give it to her, but made a statement to the effect of "you don't like authority, do you." This greatly agitated Smoker who perceived this as a calculated act intended to degrade her. Sometime during this period the Respondent offered to resign as guardian, but Smoker was reluctant to have the bank assume that role and declined his offer.

Mrs. Smoker, with the assistance of a friend, Bobby Ritchey, contacted another attorney, Adrian Marks, to discuss the termination of her guardianship. As arranged by Marks, two physicians examined her; both believed her to be competent to manage her affairs, though one found her to be in the early stages of senility. After Mrs. Smoker informed the Respondent that she had contacted Adrian Marks, and after some unfriendly interchanges between the Respondent and Marks and the Respondent and Bobby Ritchey, the Respondent, on February 12, submitted two petitions to Judge Jeffrey R. Smith, Judge Pro Tem of the Carroll Circuit Court. The Respondent (1) requested that certain persons, particularly Bobby Ritchey, be restrained from interference with Respondent's relationship with his ward and (2) objected to the filing of any pleadings allegedly signed or authorized by the ward and (3) sought a protective order against his production of any documents.

On February 13, Kate Smoker directed Attorney Marks to proceed and, on February 14, he filed a Petition to Remove the Conservator and Appoint a Successor Conservator. A hearing on the petition was scheduled for February 18th. Sometime between February 14th and 19th, the Respondent had a telephone conversation with Kate Smoker during which he read to her a bizarre fish story. It was as follows:

"He would introduce his bills in committee and the chairman would always thank him. They were always very courteous. They'd say something like "we'll be glad to give this bill due consideration" and of course, before the session was over, they'd have chopped everyone to ribbons and finally one day when someone told him that his bill would get due consideration, he let all of his frustrations out. He reared up, eyes flashing and stuck out his finger and said, "Yes, Mr. Chairman, I know the consideration you'll give this bill. It's the consideration of the fisherman for the shad, Mr. Chairman," he said. "When the fisherman catches the shad and brings it into the boat the poor fish flips and flops and

tries to escape and the fisherman speaks so politely to the shad." He says, "Lie still, little shad, I am not going to hurt you. I am going to treat you well. I'm, not going to do a thing more to you except cut your head off. And after that I'm not going to do a thing to you except cut all your bones out." And he pounded on the committee table and said, "That's the consideration I expect from you, Mr. Chairman, the shad treatment, Mr. Chairman.... the shad treatment and I may have to take it, but I will fry in hell before I say thank you."

Kate Smoker took the point of the story to be that, on her death, her estate will be carved up. This particular incident occurred during a time of great stress for Mrs. Smoker and was calculated to cause her further stress and discomfort.

After some deliberation, the Respondent himself filed a Petition to Terminate the Conservatorship. In the meantime, Mrs. Smoker had, on February 23, 1977, executed a new will drafted by Attorney Marks. It did not provide for an educational trust. She made a modest bequest of farm land to Bobby Ritchey and left the residue equally divided between a trust for the Burlington Methodist Church and the Burlington Cemetery.

After filing of the Petition to Discharge and Remove by Attorney Marks, and the Petition to Terminate by Respondent, the Respondent began delaying and resisting action on these petitions. On February 23, Attorney Marks by letter, agreed to respondent's Petition to Terminate and suggested a form decree which would end the conservatorship as asked for by the Respondent. The Respondent failed to answer. Further discussion also resulted in Respondent refusing to agree to the grating of his own petition. Between March 9 and March 15 three physicians filed their written reports with the Court in which each of them affirmed that Kate Smoker was of sound mind and capable to manage her own affairs. On April 12, failing to get an agreed entry from the Respondent on his own Petition to Terminate, her attorneys filed a reply which admitted his alle-

gations that the guardianship should be terminated. On April 19, Smoker's attorneys also filed a Motion for Summary Judgment contending that the pleadings showed that the parties and all of the physicians were in agreement as to Smoker's competence. The Court took judicial notice of the doctor's reports, finding that they need not be called as witness and limited the issues for hearing.

On May 11, the date of the scheduled hearing, the Respondent filed his "Objection to Court Order" objecting to the foregoing limitations and objecting to the doctor's reports. On the same day he also filed a response to the Motion for Summary Judgment objecting to the granting of his own Petition to Terminate without a hearing on Smoker's Petition to Remove because the latter petition, he claimed, "has cast doubt on the character of William Briggs by innuendo." The hearing was again continued, this time to May 26, to allow Dr. Wagoner, who was then unavailable, to testify in person. During the time after the filing of the Petition to Remove and the ultimate return of her property, Kate Smoker was in a state of strain and emotional distress as a direct result of Respondent's continued control of her property and her inability to alter this.

On May 26, the Court entered its termination order. Immediately after, Smoker executed a codicil to her 1977 Will reaffirming its terms. The order of termination provided that Kate Smoker could take over her business affairs immediately, the Respondent was to file his final report within two weeks, $2,000 was to be transferred to Smoker for her immediate use, and that her will, tax papers, and all other papers be available to her at the time the final report was submitted. Even at this stage, there were causes of further friction. The $2,000 was made available before June 15, but the Respondent gave it no priority; numerous business records, including checking account records were not timely delivered. The Respondent took no special steps to return the lock box key though it was delivered on August 2, 1977.

The Respondent objected to being required to file his claim as conservator and attorney claiming the lifetime fee contract with Smoker. Upon the overruling of his objections, he filed a claim for $17,585 for administering the guardianship from November 24, 1976 to May 25, 1977, a total of 6 months and 2 days. Though his prayers for relief were in the alternative, Respondent's ultimate goal was to assure the payment of the $10,000 lifetime contract. It was during these lengthy termination proceedings that the Respondent became aware that Smoker and her attorneys had filed a grievance with the Disciplinary Commission.

The matters scheduled for conclusion as part of the guardianship's final report included (1) determination of Respondent's fee; (2) the Ward's objection to the final report; (3) Respondent's claim for damages because of defamation; and (4) claim for personal injuries and damages by the Ward against the Respondent.

Between 1977 and 1979, Smoker managed her own affairs but there was a gradual erosion of her alertness and increased symptoms of senile dementia. In anticipation of this deterioration, her evidentiary deposition was taken for this proceeding on November 22, 1977. She passed away on November 21, 1979, approximately two weeks prior to the commencement of the trial scheduled on the final report of her conservatorship.

On November 26, 1979, the Respondent filed sworn objections to the probate of "any will" Smoker may have executed after February 24, 1970. Respondent's ultimate purpose in contesting the 1977 Will and codicil was to preserve his own claim and all of the benefits which the 1970 Will, as drafted by him, had contained. Smoker's competence at the time of the execution of the 1977 Will was not challenged; his claim was based on the issue of undue influence in the drafting of the 1977 Will on which the Respondent felt he could prevail.

Trial on the guardianship's final report and related matters was held over a period of thirty (30) trial days, between December 3, 1979, and August 7, 1980. Though Smoker's Petition to Discharge was not an issue because the guardianship had been terminated, substantially all allegations therein were litigated during this trial. The trial court approved the final report except for the guardian's fees and attorney fees, all of which were denied based upon apparent conflict of interest; Respondent's claim to the $9,000 certificate of deposit was set aside and the underlying contract for lifetime legal services was rescinded upon a theory of undue influence; Smoker's administrator's claim against the Respondent for misfeasance in managing the estate was denied. Included in the latter argument was an attempt to recover for psychological abuse and emotional strain, but the court held that Smoker's death rendered any such issue moot. Respondent's claim for defamation allegedly caused by pleadings filed on July 14, 1977, was upheld, but he received nominal damages of $1.00. The trial court further concluded that no oral contract nor implied contract for legal services had existed prior to November 9, 1976, that the prior services were rendered gratuitously and that fees could not be recovered on a quasi-contractual basis. Except for reversal of a $25 fee awarded to the Respondent and an order that appellate attorney fees be paid, the Court of Appeals affirmed the trial court. Rehearing and transfer were subsequently denied.

A hearing on the will contest was scheduled to commence in November, 1980. On November 8, 1980, Mrs. Briggs conveyed to Charles Vaughn, opposing attorney, a written offer to settle the will contest and Respondent's claim in the Smoker estate. The settlement offer was for $29,250, such sum being 3/4 of the attorney fees which Mrs. Briggs estimated the Smoker estate would expend in further defense of the will contest. Thereafter the Respondent contacted Reverend Arthur A. Schenck. The Reverend Schenck was a member of the Burlington United Methodist Church and a member of the church's Charge Conference

and Administrative Board, the bodies within the church which had decision-making authority with respect to any settlements. The Respondent wanted the settlement to be communicated to the Church Board; he could not present the offer himself because the attorney for the church had forbade such presentation. The Chairman of the Administrative Board of the Church rejected the idea of presenting the settlement.

An eleven day trial to a jury ensued and, after eight hours of deliberation, the jury returned a verdict against the Respondent, effectively upholding the 1977 Will.

On review before us and at the hearing stage of this proceeding, the Respondent makes sweeping challenges to the entire proceeding, claiming numerous constitutional infirmaties and arguing for dismissal of this case. The framework of his petition for review is such that issues overlap, are difficult to discern, isolate or address in an orderly manner. The Hearing Officer has made extensive findings and conclusions as to Respondent's constitutional challenges of colorable merit. At this juncture, we will address the general challenges directed to the entire proceeding; challenges to specific disciplinary rules and charges are resolved within this Court's determination of possible misconduct by reason of the above-noted findings.

A primary issue raised by the Respondent is his contention that delay in bringing this matter to a hearing has served to deny him his constitutional right to a speedy trial and due process of law and has visited cruel and unusual punishment upon him.

On this issue of delay, the Hearing Officer found, and we agree, that the Disciplinary Commission received a complaint letter from attorney Marks in July, 1977; it was followed by a grievance submitted by Mrs. Smoker and her attorneys, Marks and Powers. After determining that basis for further investigation existed, the Executive Secretary of the Commission set in motion further investigatory procedures which included notice to the Respondent and an invitation for any response the Respondent may deem appropriate. Again, in accordance with Admission and Discipline Rule 23, and standard procedures, the Commission, by a vote on July 14, 1978, decided to file a disciplinary action against the Respondent; the complaint was filed on October 24, 1978. On October 30, 1978, the Honorable Harold Staffeld was appointed as Hearing Officer.

Respondent was first represented by attorney Thomas Ives, then Attorney James Stewart of Indianapolis, until Stewart's death in June, 1983. Stewart's partner, Gilliom, withdrew from the representation some months thereafter. After his appointment, the Hearing Officer did not schedule the case because much of his time was taken up by the so called "Pinto" case, though the Commission attorney, Hughes, wrote a letter requesting a pretrial conference. Informally, Attorney Stewart and Hughes, had agreed to await the result of the pending litigation before proceeding to trial in this cause. As noted earlier, the guardianship trial lasted until August 7, 1980, and final judgment was entered on November 5, 1980. Shortly thereafter, the will contest was commenced; judgment was entered on December 9, 1980. Subsequently, Hearing Officer Staffeld became seriously ill and died in the fall of 1981. In the interim, new grievances were filed against Respondent and his spouse and law partner based upon their action in the guardianship and will contest trials. This Court appointed a second Hearing Officer and, upon Respondent's objections, removed him and appointed the present Hearing Officer who qualified on February 24, 1982. Based on the new grievance, the Commission, on September 10, 1982, approved the filing of complaints against the Respondent and his wife. On July 19, 1983, the Commission filed an amended complaint against the Respondent and a Verified Complaint against Florence Ann Briggs. Any delay between approval of the latter complaints and their filing was incidental delay related to the workload and scheduling of the Commission's attorneys.

Respondent's claim to a Sixth Amendment Right to a speedy trial is not supported by authority. The Sixth Amendment of the *Constitution of the United States* speaks of rights in "criminal prosecutions"; this Court has held that a proceeding such as the one before us is not a criminal proceeding and the application of standards generally afforded a criminal defendant is not appropriate here. *In re Roberts* (1983), Ind., 442 N.E.2d 986. Similarly, the Respondent has failed to cite nor could we find any authority which could support his contention that Article 1, Section 12 of the *Constitution of Indiana* is applicable to these proceedings. Respondent's related claim that the passage of time constituted cruel and unusual punishment is likewise unsubstantiated and without merit.

The Respondent also claims that the delay has resulted in a violation of his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the *Constitution of the United States* and Article 1, Section 12 of the *Constitution of Indiana.* In the past we have had several occasions to examine the applicability of civil and criminal due process requirements in the context of a disciplinary proceeding, and we have measured these standards within the unique character of these proceedings. *In re Roberts, Supra.* Due process, as applied to disciplinary proceedings, requires notice of the charges and an opportunity to be heard. *In re Ruffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 17, reh. den. 391 U.S. 961, 88 S.Ct. 1833, 30 L.Ed.2d 874; *In re Roberts, Supra; In re Wireman* (1977), 270 Ind. 344, 267 N.E.2d 1368,. cert. den. 436 U.S. 904, 98 S.Ct. 2234, 56 L.Ed.2d 402; *In re Murray* (1977), 266 Ind. 221, 362 N.E.2d 128; *In re Stivers* (1973), 260 Ind. 120, 292 N.E.2d 804. Beyond these requirements, there may be factual situations in which the expiration of time destroys the fundamental fairness of the entire proceeding, thus, rising to the level of due process violation. *In re Wireman, Supra.* Both parties made reference to a four-factor speedy trial test set out in *Barker v. Wingo* (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, and its Indiana progeny. In the context of the proceeding before us, the four factors, 1) length of delay; 2) reason for the delay; 3) assertion of a desire for a speedy trial, and 4) prejudice arising from the delay, can provide guideposts for our deliberation; however the premise of our examination is not whether the Respondent was denied a speedy trial, but whether, in light of the totality of the circumstances, the proceeding afforded fundamental fairness.

We agree, as the Hearing Officer found, that the Respondent made no request for an expedited hearing and, in fact, through his counsel, agreed to postponement of this hearing pending the outcome of the termination of the guardianship matter and the will contest. We fully agree with the Hearing Officer's rejection of the contention that the incidental delay occasioned by the Commission's staff scheduling causes constitutional infirmity. Respondent's claims of prejudicial harm due to loss of witnesses, loss of evidence, loss of his trial attorney and the originally appointed Hearing Officer fail to persuade us. As the Hearing Officer found, preservation of evidence in this case was far easier than might have been in many others. The Respondent was put on notice that this action would result and had more than ample opportunity to make arrangements to preserve whatever he deemed necessary. Respondent's claim of harm due to loss of his attorney and earlier Hearing Officer is without merit; as the Hearing Officer concluded, we agree that fundamental fairness is not indelibly attached to the participation of any one individual. In light of the findings and foregoing considerations, we conclude that in this case, the lapse of time between notice to the Respondent and the hearing does not constitute denial of due process.

The Respondent next contends that this Court, the Hearing Officer and the Disciplinary Commission have all lost jurisdiction of the case because 1) a provision in Admission and Discipline Rule 23, Section

13, that a hearing take place within 60 days has not been followed; 2) the rule has been applied in an unconstitutional fashion; and 3) this postponement has caused the entire proceeding to be "in excess of jurisdiction". The cases referred to in support of his contention have no precedential value to proceedings involving discipline of attorneys. This Court derives its jurisdiction over discipline of disbarment of those admitted from Article 7, Section 4, *Constitution of Indiana.* This Court has previously held that there is no authority for the proposition that expiration of the 60 day period found in Admission and Discipline Rule 23, Section 13 establishes a constitutional infirmity. *In re Wireman, Supra.* We are further mindful of the fact that, through his counsel, the Respondent agreed to postponement of the hearing. In conclusion, we find this argument without merit.

■ Respondent contends that he was denied effective judicial review and right to seek redress of grievances, including redress of constitutional errors. This claim is premised on the contention that the Respondent was deprived of a fair and adequate opportunity to present his constitutional claims because he did not receive a bifurcated hearing as requested. The Respondent has cited to no authority or argument which would tend to support his proposition; his reliance on the case of *In re Sekerez* (1984) 458 N.E.2d 229 is misguided. Additionally, it is clear from the record that the Hearing Officer expanded more than adequate effort on hearing and evaluating Respondent's allegations of constitutional infirmities. In conclusion, we find this argument to be insupportable.

■ Respondent claims that he was deprived of his constitutional right to have compulsory attendance of witnesses because his subpoenas to Commission members were quashed and his questions propounded to the Commission Executive Secretary and Attorney were limited. We note that no record has been submitted as to the latter contention. This argument relates to Respondent's attempt to allege and prove that he was selectively prosecuted and thus, denied equal protection of the law. The Hearing Officer found and we agree, that Respondent's chief purpose was to inquire of the Commission members why they did not seek to prosecute the other attorneys involved in the protracted Smoker litigation. We agree with the Hearing Officer's finding that there was no showing that the members had firsthand knowledge of some fact in issue. Respondent's contention fails to convince us that the Hearing Officer's decision relative to these witnesses and the quashed subpoenas was erroneous or somehow constitutionally improper.

■ The Respondent further claims denial of a fair hearing due to several alleged constitutional infirmities caused by violations of specific provisions of Admission and Discipline Rule 23. Apparently during 1978, he was not advised, pursuant to Admission and Discipline Rule 23, Section 10(b), that the grievance filed against him had been docketed for investigation. We fail to see, nor has the Respondent been able to show us, why or how such omission could be a constitutional bar to these proceedings. He contends that the Commission failed to give him notice of investigation of charges beyond those contained in the grievance filed by the grievants. This Court has held that, so long as the grievance serves to inform the Respondent of the general nature of the charges against him, there is no denial of due process merely because the complaint filed by the Commission is not limited to the charges specified in the grievance. Because grievances are drafted by those unskilled in the law, they will not be strictly construed. *In re Wireman, Supra.*

Thirdly, he contends that the Commission failed to find "probable cause." We note that Admission and Discipline Rule 23, Section 11(d) specifically provides for the finding of "reasonable cause." We, thus, conclude that the provisions of Admission and Discipline Rule 23 were not applied to the Respondent in an unconstitutional manner and did not result in an unfair proceeding.

The Respondent contends that his right to freedom of speech was abridged when he was denied a request to appear before the Disciplinary Commission during the administrative stage of the proceeding and by Admission and Discipline Rule 23, Section 14, which proscribes dilatory motions and motion to dismiss. Again, the Respondent has failed to refer us to authority which would tend to support his claim. We find these contentions without merit.

The remaining issues on review before us relate to the specific charges and will be resolved within that context.

By way of background, we find that the Verified Complaint filed against the Respondent in 1978 and the Amended Verified Complaint filed in 1983 charged that, by giving advise on and drafting the 1970 Will of Kate Smoker, the Respondent engaged in conflict of interest and failed to seek his client's objectives in violation of Discipline Rule 5–101(A) and 7–101(A)(1) of the *Code of Professional Responsibility for Attorneys at Law*. The Respondent moved to dismiss these charges because they alleged misconduct occurring prior to the adoption of the *Code*. The Hearing Officer allowed the Commission's attorney to amend the complaint and charge the same misconduct under the *Canons of Professional Ethics of the American Bar Association*.

The Respondent challenges this amendment arguing that, 1) he is somehow being punished retroactively; 2) allowing such amendment was beyond the jurisdiction of both the Commission and the Hearing Officer; 3) the amendment was not authorized by the Commission; 4) the Respondent was not given the opportunity to respond to the Commission; and 5) the Canons under which he was charged are unconstitutionally vague and, therefore, void. Respondent's contentions are not convincing.

The Respondent was on notice in 1978 as to the conduct which was alleged to constitute misconduct. The Commission's initial determination that Respondent's alleged conduct is unethical was not altered by the subsequent amendment. This Court, prior to the adoption of the present disciplinary rules, did impose discipline, and the standards for such conduct were the *Code of Professional Ethics of the American Bar Association*. *In re Crumpacker* (1978), 269 Ind. 630, 383 N.E.2d 36, cert. denied 100 S.Ct. 481, 444 U.S. 979, 62 L.Ed.2d 406 (1979); *In re Kuzman* (1975), —— Ind. ——, 335 N.E.2d 210. The amendment to the Complaint more appropriately set out the standard by which the same conduct was measured prior to the adoption of the *Code*. Similarly, we are not persuaded by Respondent's unsubstantiated claim that the Canons he is alleged to have violated are void for vagueness.

In addition to the foregoing procedural and constitutional challenges, the Respondent contends that during 1968, when he drafted Mrs. Smoker's earlier will, he advised her to seek another attorney. Thus, he contends, he was relieved of any obligation relative to the 1970 Will. We find that such advise was not pertinent to the 1970 Will, and was insufficient to fully appraise Smoker of the potential conflict, tax and other legal ramifications embodied in the 1970 Will. The resulting scenario of events is a sad example of the sort of consequence intended to be proscribed by the Canons and, presently, by Disciplinary Rule 5–101 of the *Code*. We conclude that, by drafting the 1970 Will of Mrs. Smoker, and counseling her thereon, without fully disclosing the legal ramifications of the document and the potential conflict of interests, the Respondent violated Canons 6 and 11 of the *Canons of Professional Ethics*.

The Respondent is further charged with engaging in conflict of interest in violation of Disciplinary Rule 5–101 and 1–102(A)(4) and (6) of the *Code of Professional Responsibility for Attorneys at Law*, by advising and participating in the execution of a joint certificate of deposit in his and his client's name.

We conclude from the foregoing findings that the Respondent engaged in the charged misconduct.

The Respondent is charged with harassing his client thereby engaging in illegal conduct involving moral turpitude, conduct involving fraud, deceit and misrepresentation, conduct that adversely reflects on his fitness to practice law, and conduct prejudicial to the administration of justice, in violation of Disciplinary Rule 1–102(A)(3), (4), (5) and (6). In light of the findings on this issue, we conclude that the Respondent's acts of harassment toward his client constitute misconduct, in violation of Disciplinary Rule 1–102(A)(5) and (6).

■■■ The Respondent is charged with violating Disciplinary Rules 5–101 and 1–102(A)(1), (5) and (6) of the *Code* by unreasonably delaying the termination of his client's conservatorship and particularly delaying the restoration of control over her property. He contends that imposing discipline for his filing pleadings in response to Smoker's Petition to Discharge him as conservator constitutes denial of his constitutional right to seek redress of grievances and denial of his right to free speech guaranteed under the First Amendment of the *Constitution of the United States* and Article 1, Section 12 of the *Constitution of Indiana.*

The rights claimed by the Respondent are not absolute but are measured within the context of competing social values; each prohibition, circumscribed by the factual setting, is measured against the affected state interest and the imposed limitations. *In re Friedland* (1981), 275 Ind. 214, 416 N.E.2d 433. The Respondent had a professional duty to pursue and protect his client's interests. Neither his personal interests or the interests of others should be permitted to dilute this duty. E.C. 5–1. The availability of independent and competent legal representation lies at the core of our system of justice. We must examine Respondent's actions and contentions in light of this weighty public interest. We find that he intentionally set out to frustrate and hinder his client in an effort to vindicate his reputation and exact retribution. The termination of a conservatorship, where three physicians unanimously agree

as to the competence of the ward, normally would be a simple and routine matter. However, in this instance, the Respondent treated this proceeding as an adversary one and sought to vindicate his position and allay what he perceived were aspersions to his reputation, while being fully aware of the extreme emotional stress caused to Smoker, "for the purposes ultimately designed for his own benefit, namely to protect his own reputation." Under these circumstances, we find that Respondent's acts were not protected and a finding of misconduct and imposition of sanction is not an unpermissable infringement on his right to free speech or his right to petition the government for redress. We conclude that the Respondent engaged in the misconduct as charged.

The Respondent was also charged with attempting to collect an illegal or clearly excessive fee, in violation of Disciplinary Rule 2–106(A) and (B). The Hearing Officer concluded and we agree, that the evidence was not sufficient to prove misconduct under this charge.

The Respondent is further charged with violating Disciplinary Rule 7–102(A)(1), (5) and (6) by contesting, in bad faith, a will which he had no probable cause to consider invalid. The Disciplinary Commission has challenged the Hearing Officer's conclusion that there is insufficient evidence to prove that the Respondent filed the will contest in bad faith merely to harass or maliciously hurt another. The Hearing Officer made extensive findings on this issue and determined that the Respondent was motivated by retaliatory feelings, was aware that the will contest could delay the guardianship final hearing and the ultimate determination of this proceeding; nonetheless, the Respondent believed he could win his claim based on the issue of undue influence. We agree with this assessment and, thus, find that the evidence is not sufficient to support a finding of misconduct. This conclusion renders moot Respondent's challenges to this charge.

The complaint charges that the Respondent's conduct is also violative of Discipli-

nary Rule 7–104(A)(1) in that he communicated with a party he knew was represented by an attorney. In light of the foregoing findings, we further conclude that the Respondent engaged in the charged misconduct.

Lastly, the Complaint incorporates the entire course of conduct under one charge alleging a pattern of misconduct designed to damage Respondent's client, and charges a violation of Disciplinary Rule 1–102(A)(1), (2), (5) and (6) of the *Code.*

We find, as did the Hearing Officer, that this charge is repetitive and redundant; as such, we find no misconduct. *In re Stanton* (1986), Ind., 492 N.E.2d 1056; *In re Sekerez, Supra.*

■ Upon finding misconduct, we must now assess an appropriate sanction. As part of this deliberation, we consider the nature of the violation, the specific acts of the Respondent, its impact on the public, this Court's responsibility to preserve the integrity of the Bar and the risk, if any, to which we will subject the public by permitting the Respondent to continue in the profession or be reinstated at some future date. *In re Stanton, Supra; In re Duffy* (1985), Ind., 482 N.E.2d 1137; *In re Hailey* (1985), Ind., 473 N.E.2d 616.

■ Reflecting upon Respondent's conduct vis-a-vis his client, Mrs. Smoker, this Court is not unmindful of the strong emotional involvement of all participants. It is, nonetheless, amazing that an attorney with Respondent's experience and length of practice, would undertake to draft a will for the elderly widow making him and his family substantial beneficiaries, without any real concern for the ethical consequences. Having once breached his professional duties, the Respondent embarked on further reprehensible conduct by harassing his client/ward and manipulating the judicial process to exact further retribution. The Respondent, motivated by his financial expectations and a desire for personal vindication, lost sight of his professional obligations to his client and the ethical standards of his profession. In light of these considerations, the nature of the violations,

the specific acts of the Respondent and this Court's responsibility to the public, we conclude that a period of suspension is warranted by respondent's acts of misconduct.

IT IS, THEREFORE, ORDERED that the Respondent, William Briggs, be suspended from the practice of law for a period of two (2) years beginning February 16, 1987.

Costs of this proceeding are assessed against the Respondent.

DICKSON, J., not participating.